STATE of Missouri, Plaintiff–
Respondent,

v.

Nicholas W. HIBBERT, Defendant–
Appellant.

No. 22822.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 16, 2000.

Motion for Rehearing and Transfer
Denied March 8, 2000.

Application for Transfer Denied
April 25, 2000.

Andrew A. Schroeder, Asst. Public Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for respondent.

JAMES K. PREWITT, Judge.

Following jury trial, Defendant was convicted of murder in the second degree and kidnapping. He was sentenced to consecutive terms of imprisonment of ten years for second-degree murder and five years for kidnapping. Defendant appeals, presenting two points relied on.

■ For his first point, Defendant asserts that the State failed to prove beyond a reasonable doubt that he was guilty of second-degree murder and kidnapping, "in that the state presented no evidence that Appellant performed any act or spoke any words that aided or encouraged Steve Johnson and Michael Davis in kidnapping Rick Kimbrough." In reviewing this matter, we consider the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict and disregard contrary inferences. *State v. Smith,* 944 S.W.2d 901, 916 (Mo. banc 1997).

On April 4, 1997, Defendant and his father went to the Joplin Police Department and requested to speak to Officer Greg Dagnan. Defendant, who was seventeen years old at the time, told Officer Dagnan that he had information concerning the death of Rick Kimbrough. Kimbrough's badly-decayed body had recently been found in a local rock quarry known as Bullfrog Pond. Defendant volunteered the following account of the events that occurred on March 6, 1997, knowing that his statement was being tape-recorded.

On March 6, Defendant spent most of the day with his best friend, Michael

Davis. After job searching and test driving cars, Defendant and Davis stopped by Cindy Knight's house to return the truck they had been driving. The truck belonged to Steve Johnson, who was living with Cindy Knight. Johnson had previously dated Davis' mother, Tammy Davis, for eight years. Although he and Tammy never married, Johnson treated Davis like a stepson, and they remained close after Johnson's relationship with Tammy Davis ended. Johnson had dated other women since the breakup, but he was extremely upset that Tammy Davis was dating someone else. She was dating Rick Kimbrough, the victim.

When Defendant and Davis returned the truck, Johnson asked them to stay for dinner, which they did. After dinner, Johnson offered to drive the boys home. The three of them then left the house in Cindy Knight's Blazer. Johnson was driving, Davis was in the passenger seat, and Defendant was in the back seat. Johnson did not drive the boys home, instead he drove to Tammy Davis' residence. Johnson said he wanted to see if Kimbrough was at Tammy's residence so that he could follow him to learn where he lived. Johnson had not kept secret his intent to sometime fight Kimbrough, and one time when he was "whiskey drunk," he stated that he was going to kill Kimbrough. Johnson drove by Tammy's house and, upon seeing that Kimbrough was there, parked close enough to the house that he could see Kimbrough's vehicle, a Ford Bronco.

Less than an hour later, the three saw Kimbrough and Tammy leave in the Bronco. Johnson followed until he realized that the two were going to Burger King. He then turned around and drove back to Tammy's residence, awaiting their return. Fifteen minutes later, Kimbrough and Tammy arrived back at the Davis residence, apparently unaware of Johnson and the boys nearby.

Shortly after Kimbrough and Tammy returned, Johnson drove to Hall's Food Mart, got out of the Blazer and placed a call from a pay phone. When Johnson returned to the car, they drove back to Davis' residence. A short time later, the three saw Kimbrough walk out of Tammy's house and get into his Bronco. Johnson followed Kimbrough to his apartment on East 20th Street in Joplin, and parked within viewing distance of the apartment. When they saw a light come on in the upstairs apartment, Johnson told the boys to get out of the Blazer and follow him. As the three approached Kimbrough's residence, Defendant saw what appeared to be a knife in Johnson's back pocket. Seeing the knife surprised Defendant because Defendant knew Johnson to be a fist-fighter, not someone who would use a deadly weapon.

The trio circled around and entered the front of the apartment building at about the same time that Kimbrough started heading down the stairs to exit the apartment. When Kimbrough made it to the bottom of the stairs, Johnson jumped him and started making punching motions. Defendant realized Johnson was stabbing Kimbrough when he heard Kimbrough scream, "You're stabbing me!" Johnson told Defendant and Davis to go up the stairs to the apartment and find Kimbrough's keys. They boys followed Johnson's instructions, but returned downstairs as soon as Johnson told them that Kimbrough had his keys on his person. When Defendant walked down the stairs, he could see Johnson holding a knife to Kimbrough's throat.

Johnson told Defendant to go sit in the Blazer and await his signal. From where Defendant sat in the Blazer, he could not see what was transpiring at the apartment complex. When Defendant saw the lights of Kimbrough's Bronco, he started the Blazer and followed the Bronco to Bullfrog Pond at the rock quarry. Defendant could see Davis' silhouette in the driver's seat, and Johnson's silhouette in the rear passenger seat.

Before approaching Bullfrog Pond, Defendant pulled up alongside the Bronco, and Johnson directed Defendant to "go up to the street and wait, and we'll be back." Defendant followed Johnson's instructions and parked the Blazer up the street, away from the quarry. From where he parked, Defendant could not see what was happening at Bullfrog Pond. About one hour later, Davis walked up to where Defendant was parked, and told Defendant that Johnson wanted him to come down to the pond because Johnson had "lost" Kimbrough. When Defendant arrived at the pond, Johnson said: "When I threw him and he was in the water, ... he splashed, and then he just quit splashing and there was nothing." Upon Johnson's instruction, Defendant retrieved a flashlight. Johnson and Davis then walked around the rock quarry looking for Kimbrough. When Johnson and Davis determined that Kimbrough could not be found, they joined Defendant and the three walked back to the Blazer.

As Johnson began to drive away, he said he had stabbed Kimbrough in the head and pushed him into the water. After driving for about ten minutes, Johnson turned the Blazer around, drove back to Bullfrog Pond, and told the boys to take Kimbrough's Bronco "out in the chats and get rid of it." Defendant and Davis protested, and argued that they could just leave the truck where it was. Johnson insisted, so the boys took the Bronco and parked it on railroad tracks. Johnson was not satisfied with that, so he ordered the boys to take the Bronco to "the cave in the chat piles," and to punch a hole in the gas tank and set it on fire. Defendant and Davis followed Johnson's instructions, except that instead of punching a hole in the gas tank, they poured a bottle of "purple cologne" on the front seats of the Bronco and then set it on fire.

Johnson picked up the boys on a country road near the cave. Johnson then drove back to Kimbrough's apartment, where he tried to clean the blood on the front porch using a blanket and a bottle of Sprite. From the apartment, Johnson drove to a Dillon's store and threw the blanket and Sprite in a Dumpster. Before Johnson dropped the boys off at Defendant's home, he made them strip down to their underwear and then he threw their clothes and shoes into a ditch near Defendant's home. In a subsequent statement to the police, Defendant recalled that Johnson had thrown the knife in a separate ditch.

In addition to giving the foregoing information, Defendant admitted to Officer Dagnan that he did not tell the police the truth when they first questioned him three days after Kimbrough's death.

Defendant was subsequently charged with felony murder in the second degree, § 565.021, RSMo 1994, and kidnapping, § 565.100, RSMo 1994. Jury trial was held on December 1 and 2, 1998. Defense counsel filed motions for judgment of acquittal at the close of the State's evidence, and at the close of all evidence. Both motions were overruled, and the jury found Defendant guilty on both counts. On December 28, 1998, defense counsel filed a motion for new trial, which also was overruled, and Defendant was sentenced. This appeal followed.

■ Defendant argues that there was no evidence to show that he performed any act or spoke any words that aided or encouraged Johnson and Davis in the kidnapping. We disagree. There was evidence that Defendant drove the Blazer from the apartment to the Bullfrog Pond area. Without having that second vehicle available, it would have been necessary for Johnson and Davis to either walk out of that remote area, or to drive the victim's vehicle.

■ Any evidence fairly showing affirmative participation by defendant in aiding another to commit a crime is sufficient to support conviction. *State v. Howard*, 896 S.W.2d 471, 494 (Mo.App.1995). Aiders and abettors who act with common purpose with active participants in the crime

incur criminal liability by any form of affirmative advancement of the enterprise. Proof of any form of participation by a defendant in the crime is sufficient to support a conviction. *Id.* at 495. *See* § 562.041.1(2)(a person is criminally responsible for the conduct of another when before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid another person in committing the offense.)

■ Accomplices are criminally liable if they affirmatively participate in the crime. *State v. Friend,* 936 S.W.2d 824, 827 (Mo.App.1996). Affirmative participation may be proven by circumstantial evidence, including presence at the scene of the crime, flight therefrom, and association with others involved before, during and after the commission of the crime. *Id.* Guilt under § 562.041.1(2) for aiding and abetting also encompasses acts of encouragement. Encouragement may be conduct that by any means countenances or approves the criminal actions of another. *Id.*

■ Additionally, there was testimony that Defendant first denied to the police that he was involved in the death of Kimbrough. When proven false, exculpatory statements evidence a consciousness of guilt. Guilt may be inferred when an accused attempts to deceive the police, as in making a false exculpatory statement. *State v. Myszka,* 963 S.W.2d 19, 24 (Mo. App.1998). Untrue denials can constitute admissions as well as manifesting a consciousness of guilt. *State v. Byrd,* 815 S.W.2d 103, 105 (Mo.App.1991). We find that Defendant's initial denial of involvement was a manifestation of his consciousness of guilt, and therefore was evidence that he aided or encouraged the kidnapping.

■ Defendant also participated in the burning of the Bronco; the result of which was destruction of evidence. An attempt to destroy evidence shows a consciousness of guilt. A permissible inference of guilt may be drawn from acts or conduct of an accused subsequent to an offense if they tend to show a consciousness of guilt by reason of a desire to conceal the offense or accused's role therein. The spoliation of evidence bespeaks of a consciousness of guilt from which a permissible inference of guilty may be drawn. *State v. Lockett,* 639 S.W.2d 132, 135–136 (Mo.App.1982).

Point I is denied.

■ For his second point, Defendant asserts that the trial court erred in overruling objections he made during the State's opening portion of its closing argument, because the State was urging the jury to find that Defendant was guilty of aiding and abetting Johnson and Davis based on actions after the kidnapping and murder had occurred.

Defendant bases his contentions upon Section 562.041.1(2), RSMo 1994, which limits the responsibility for the conduct of another to be either before or during the commencement of an offense. During the opening part of the State's closing argument, the following occurred:

[Prosecutor:] The next instruction I want to talk to you about is the verdict director for murder in the second degree. First element, that the defendant committed kidnapping as submitted in Instruction Number 5. You have to find first that the defendant committed the kidnapping that we allege that he did, the one we just talked about.

Second, that Steve Johnson caused the death of Rick Kimbrough by stabbing him. There is no doubt that Rick Kimbrough died as a result of those stab wounds.... There is no dispute about that element.

Third element, Rick Kimbrough was killed as a result of the perpetration of that kidnapping. Again, under the evidence, there is no dispute. You find all three of those elements, you have to find him guilty of murder in the second degree.

Now, what evidence do we have that shows he aided there or he was an active participant? After Bullfrog, okay, he and Mike Davis take that Bronco—

[Counsel]: Objection. Can we approach the bench?

(Counsel approached the bench, and the following proceedings were had.)

[Counsel]: Your Honor, I object. I think the prosecutor is about to argue that he is guilty as an accessory or being an active participant in the murder for things that occurred after the completion of the commission of the crime. I think the evidence is clear that whatever kidnapping or murder was done was completed at this time.

Under 562.041, subsection 2[sic], any accessory liability has to be before or during the commission of the crime. The statute sets that out clearly.

[Prosecutor]: It's all part of the same plan. It's all part of the same plan to kill him from the beginning. It's just continuation of the same plan. You can't just break it off.

[Counsel]: That's what the law says, Your Honor.

THE COURT: Overruled.

(The proceedings returned to open court.)

[Prosecutor]: Mike Davis and the defendant take that Bronco to the Klan cave. And what do they do there? They set it on fire. Why are they doing that? They want to destroy evidence. They want to cover up evidence that a crime has been committed.

What else did they do? They went back to Rick Kimbrough's house, tried to clean up the blood with the blanket and the Sprite. They took that blanket and Sprite to the Dillon's store and threw it away. Again, trying to conceal evidence of the crime. He took his clothes off, he took his shoes off, and he threw them in that drainage ditch over by his house. Why? Again, he's trying to conceal and destroy evidence, any-thing that would tie him to the kidnapping and murder of Rick Kimbrough.

Ladies and gentlemen, under this evidence I think that you can find that he not only aided Steve Johnson and Mike Davis, but he as an active participant from the beginning in the crimes.

 The trial court has wide discretion in ruling on closing argument and in determining whether a comment is prejudicial. Absent abuse of discretion resulting in prejudice to the defendant, the trial court's rulings on such issues should not be overturned on appeal. *State v. Williams*, 951 S.W.2d 332, 336 (Mo.App. 1997). A prosecuting attorney's statements must be plainly unwarranted and clearly injurious to the accused to constitute an abuse of discretion. *Id.* A conviction will only be reversed on the basis of improper argument if it is established that counsel's improper comments had a decisive effect on the jury's verdict. *Id.* Additionally, this state has not adopted a *per se* rule of mandatory reversal in all cases in which objectionable comments are made by a prosecutor. *State v. Wright*, 941 S.W.2d 877, 883 (Mo.App.1997). We reverse a conviction only if the challenged comments had a decisive effect on the jury.

Defendant argues that the comments did have a decisive effect on the jury's verdict because the jury asked the trial court the following four questions during its deliberation:

1) "Do we have to find the defendant guilty of kidnapping to find him guilty of murder?"

2) "May we please have a regular dictionary and a legal dictionary?"

3) "Does the party have to be knowledgeable of a kidnapping in order to be considered an aid [sic] in the offense?" and

4) "Can we please get a legal definition of kidnapping?"

The prosecutor could urge a connection between Defendant's acts after the kidnap-

ping and murder as that showed the Defendant's guilt by destroying evidence. We note that there was other evidence sufficient to find Defendant guilty. We cannot conclude from the jury's questions that the prosecutor's statement was improper.

Point II is denied. The judgment is affirmed.

MONTGOMERY, P.J., and BARNEY, J., concur.