**STATE of Missouri, Respondent,**

v.

**Jaclyn AGEE, Appellant.**

**No. SD 30764.**

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 11, 2011.

Rosalynn Koch, Columbia. for Appellant.

Chris Koster, Atty. Gen. and John Winston Grantham, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Jaclyn Agee ("Appellant") appeals her convictions following a jury trial for one count of the class A felony of murder in the second degree, a violation of section 565.021; one count of the class B felony of burglary in the first degree, a violation of section 569.160; one count of the class A felony of robbery in the first degree, a violation of section 569.020; three counts of the class C felony of felonious restraint, violations of section 565.120; three counts of the class B felony of facilitating a kidnapping, violations of section 565.100, RSMo Cum.Supp.2004; and eight counts of the unclassified felony of armed criminal action, violations of section 571.015.[1] Appellant was sentenced by the trial court to ten years on the murder in the second degree charge and five years imprisonment on the burglary in the first degree charge with those sentences to run consecutively. The trial court further ordered that the sentences on all of the other counts would run concurrently with the sentence on the murder charge.[2] Appellant posits six claims of trial court error. We affirm the judgment and sentence of the trial court.

Viewing the evidence in the light most favorable to the jury's verdict, *State v. Goodwin*, 43 S.W.3d 805, 809 (Mo. banc 2001), the record reveals that in early 2008 Appellant and her then-boyfriend, Roy Bradshaw ("Roy"), rented a mobile home from Albert Shomaker ("Bub"), and his girlfriend, Dianne Ledgerwood ("Dianne"), in Winona, Missouri.[3] When Appellant and Roy vacated the mobile home in April of 2008, Bub and Dianne, who lived nearby, refused to refund their security deposit due to the poor condition of the mobile home upon their departure. Roy angrily confronted Bub on several occasions about the security deposit, but Bub continued to refuse to refund it to them.

On May 7, 2008, Bub, who had been at a medical appointment in Springfield, Missouri, returned home at around 2:30 p.m. to find Roy and Appellant inside his home. Upon entering the home, Roy pointed Bub's own loaded rifle at him and escorted him to the back bedroom, where Appellant was waiting for them holding Bub's loaded 12–gauge shotgun. Appellant and Roy then bound Bub's hands and feet with duct tape. Bub noticed the home had been ransacked and that Appellant and Roy were eating food from his refrigerator.[4] Although at first discussing the issue of the security deposit, Appellant and Roy then began to explain to Bub that Dianne was a police informant who had been informing the police about their apparent drug activity and they had been sent by drug dealers to kill Dianne and Bub. Bub told them he had no idea what they were talking about and even offered to sign his property over to them if they would spare his life.

At around 8:00 p.m., Dianne arrived home accompanied by Bub's cousin, Scott Shomaker ("Scott"), and his girlfriend, Leeoma Vinson ("Leeoma"). Appellant shoved Bub to the floor and placed the

---

1. Unless otherwise stated, all statutory references are to RSMo 2000.

2. Appellant was sentenced to three years imprisonment on each of the eight armed criminal action charges; ten years on the robbery charge; three years on each of the three felonious restraint charges; and five years on each of the three kidnapping charges.

3. For ease of analysis we have chosen to call some of those involved in this case by their first name. In so doing, we mean no disrespect.

4. It was also later determined that Appellant and Roy had taken $200.00 to $300.00 in cash from Bub's home.

shotgun to the back of his head while Roy hid behind the bedroom door. When Dianne approached the back bedroom, Roy called out to her and told her he wanted to talk to her. Dianne immediately ran back toward the living room yelling for Scott to call the police. Roy followed her, shot her in the back, and she fell to the floor.[5] Roy then pointed to Scott and said, "You're next." Appellant then came into the living room and calmed Roy down.

Roy then instructed Scott and Leeoma to hand over their cell phones and Appellant forced them at gunpoint into the back bedroom where they sat on the couch with Bub. Appellant stood watch with the shotgun while Scott and Leeoma were bound with duct tape. Appellant and Roy continued to tell them that they were acting under orders from the mob and that they were being watched to make sure they completed their assignment of killing Dianne and Bub.

For the next several hours Appellant and Roy screamed at their captives, threatened to kill them, and shoved various firearms in their faces. Bub, who was severely distraught over the death of Dianne, continued to bargain for his life and Scott and Leeoma appealed to Appellant and Roy to release them as well. Eventually Appellant and Roy agreed to release Scott and Leeoma after telling them that the police were in on the drug dealing in the area and that the police themselves would kill Scott and Leeoma if they reported the crime. They then told Scott and Leeoma that they would "hunt" them down and kill their children if they reported Dianne's murder. The decision was made to drive the pair into the woods and release them after firing off a few gun shots to convince the people allegedly watching them that they had been killed.

At some point in time, Dianne's body was loaded into the trunk of her car and around midnight Appellant and Roy escorted the three captives to the vehicle. Scott, Leeoma, and Bub were in the backseat of the vehicle, Roy drove the vehicle and Appellant rode in the front passenger seat with a shotgun pointed at Bub.

They drove down various dirt roads for twenty to twenty-five minutes before Roy finally stopped the vehicle. Appellant and Roy removed Scott and Leeoma from the vehicle, took them to the back of the vehicle, and opened the trunk. Roy gave Scott his wallet back but kept both of their cell phones. Roy then cut the duct tape that bound their hands with Scott's pocket knife, returned the knife to Scott and let them go. Scott and Leeoma ran into the woods and hid. They were later picked up by a passerby and went to the authorities.

Meanwhile, Roy and Appellant returned to the vehicle and began driving down gravel roads with Bub in the backseat. The vehicle then ran out of gas. Appellant remained in the vehicle with the shotgun pointed at Bub while Roy went in search of gasoline. Roy returned shortly thereafter without gasoline. He then gave Bub a crowbar and told him to dig a grave for Dianne's body. After his efforts of digging appeared fruitless, Roy told him to stop. Roy and Appellant then decided to burn the vehicle with Dianne's body inside of it. Bub told them he would help them burn the vehicle and he promised not to tell anyone they had killed Dianne. After stuffing rags in the gas tank and the front seat, Bub lit the rags on fire and ran. Roy and Appellant ran at the same time in the other direction. Bub was able to locate a home nearby and he then contacted the authorities.

5. The bullet entered Dianne's back; shattered her spinal column and several vertebrae; per-forated her major organs; and exited her chest. She died almost immediately.

Roy and Appellant fled with Bub's guns as well as $250.00 to $300.00 in cash. They were later located hiding in a cabin in the woods and, following a short stand-off, were apprehended by police. They were found in possession of Bub's guns.

After being taken into custody, Appellant was given *Miranda*[6] warnings and she agreed to make a recorded statement for the police. During this statement Appellant made no mention of being threatened or coerced by Roy into committing the crimes at issue nor did she mention that he had ever abused or mistreated her during their relationship. Following her arrest, Appellant found herself in a holding area with Roy at which time they were observed by law enforcement authorities hugging, kissing, and being affectionate toward one another.

Appellant was eventually charged with the crimes detailed above and a trial was held on April 22 and 23, 2010. At trial, Appellant repeatedly testified that she was fearful of Roy because he physically, emotionally, and sexually abused her; that she tried to run away from him but his relatives would capture her and take her back to him; that he alienated her from her friends and family and took her phone away; and that she felt she could not go to the police about his abuse because his uncle is in law enforcement and his family routinely committed crimes with no consequences. She admitted that she held Bub and the others at gunpoint and tied them up, but stated that she felt she was not free to leave the ordeal because of her fear of Roy. She further testified that she admitted her involvement in the crimes at issue because she wanted to be incarcerated and safe from Roy's family, whom she felt "would make [her] disappear." She also related that the incident when she was

affectionate with Roy occurred the day they were arrested not at a later date.

At the close of the evidence, the jury convicted Appellant of all eighteen charged counts and she was sentenced as set out above. This appeal followed. For ease of analysis we shall address Appellant's points relied on out of order.

 In reviewing the overruling of a motion for acquittal, this Court must determine if the State presented sufficient evidence to make a submissible case. *State v. Johnson*, 244 S.W.3d 144, 152 (Mo. banc 2008). A sufficiency of the evidence argument is reviewed to determine if a reasonable juror had enough evidence to find the defendant guilty beyond a reasonable doubt. *State v. Salter*, 250 S.W.3d 705, 710 (Mo. banc 2008). This Court views "the evidence in the light most favorable to the judgment, disregarding any contrary evidence and granting the State all reasonable inferences from the evidence." *Johnson*, 244 S.W.3d at 152. "Deference should be given to the superior position of the jury to assess the credibility of witnesses and the weight and value of their testimony." *Id.* "Evidence and inferences favorable to the state are accepted, and contrary evidence and inferences are disregarded." *State v. Johnson*, 284 S.W.3d 561, 572 (Mo. banc 2009).

Preliminary to our review of Appellant's first point relied on, we observe that in Counts XIII, XV and XVII of the "INFORMATION" Appellant was variously charged with the crime of kidnapping Bub, Scott and Leeoma in that she "unlawfully removed [the victims] without [their] consent from [a] residence . . . for the purpose of facilitating the commission of the felony of murder in the first degree of Dianne . . . ." In part pertinent to our re-

6. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

view, section 565.110.1, RSMo Cum.Supp. 2004, states that

[a] person commits the crime of kidnapping if he or she unlawfully removes another without his or her consent from the place where he or she is found or unlawfully confines another without his or her consent for a substantial period, for the purpose of

. . . .

(4) Facilitating the commission of any felony or flight thereafter. . . .

Now, in her first point relied on Appellant maintains the trial court erred in overruling her motion for judgment of acquittal and "in accepting the jury's verdict of guilty of kidnapping Bub, Scott and Leeoma . . . as well as [the three attendant] armed criminal action [counts]. . . ." She asserts there was error in that the State failed to prove beyond a reasonable doubt that Bub, Scott and Leeoma

were removed from the house 'for the purpose of facilitating flight after the commission of murder in the second degree' as there was no evidence of flight from the scene, but rather the evidence established that [A]ppellant and Roy removed the three so that they could let Scott and Leeoma go and dispose of [Dianne's] body.

Appellant does not contest the fact that, in concert with Roy, she unlawfully removed Bub, Scott and Leeoma from Bub's house without their consent. Her issue lies only in the State's proof that she did so while "[f]acilitating the commission of any felony or flight thereafter . . . ." § 565.110.1, RSMo Cum.Supp.2004.

We begin our analysis by noting that the term "flight" is not defined in the statutes; thus, we are led to a dictionary definition to aid in our review of Appellant's argument. *See State v. Daniel*, 103 S.W.3d 822, 826 (Mo.App.2003). Black's Law Dictionary defines "flight" as "[t]he act or an instance of fleeing, esp. to evade arrest or prosecution." Black's Law Dictionary 670 (8th Ed.1999).

■ Appellant argues the victims were removed from Bub's home so that they could be released. The record shows, however, that there was ample opportunity for Appellant and Roy to release all three captives directly from Bub's home and they chose not to do so. In fact, the record supports the more credible proposition that Appellant and Roy elected to take their victims deep into the woods and release them in order to delay their victims' abilities to alert the authorities to the crimes committed by Appellant and Roy. Regarding Scott and Leeoma, Appellant even testified at trial that the plan "was that [Roy] was going to drive off . . . the same amount of distance from their vehicle, and where they lived, which would give them a half hour to walk to their vehicle and . . . a short period of time to get home." Indeed, Appellant and Roy repeatedly warned their victims about not contacting authorities, held them at gunpoint, verbally threatened the lives of their children and took away their cell phones. All of the aforementioned evidence clearly supports a conclusion that Appellant and Roy took these steps in order to facilitate their own flight from authorities. Appellant even states in her appellate brief that the purpose of taking the victims into the woods was "to avoid harming them, and *then get away before [they] could notify authorities.*" (Emphasis added). There is simply no other believable purpose for Appellant and Roy taking Bub, Scott, and Leeoma into the deep woods prior to setting them free. It was a tactic employed to buy Appellant and Roy some time to escape the area, elude authorities, and delay the discovery of Dianne's murder. There was sufficient evidence to prove be-

yond a reasonable doubt that Appellant was guilty of three counts of kidnapping for the purpose of facilitating her flight from the scene of the crime she and Roy had committed.

█ Additionally, section 571.015.1 provides that "any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action...." As there was ample evidence Appellant held Bub, Scott, and Leeoma at gunpoint for the entirety of the time they were being kidnapped and driven around in the woods, the three armed criminal action counts premised on Appellant's involvement in the kidnappings are also supported by sufficient evidence. Point I lacks merit and is denied.

In her second point relied on Appellant asserts the trial court erred in overruling her motion for judgment of acquittal and convicting her "upon the jury's finding pursuant to Instruction No. 6, submitting felony murder, as well as Instruction No. 7, armed criminal action...." She maintains her constitutional rights were violated

in that there was no evidence that '[Dianne] ... was killed as a result of the perpetration or immediate flight from the perpetration of that burglary in the first degree' as there was no evidence from which the jury could find that [A]ppellant was committing burglary at the time of the shooting, as the crime of burglary in the first degree does not contemplate a continuing course of conduct and was completed at the point that all elements of the offense had been committed, which occurred before [Dianne] was shot.

Appellant was charged in "COUNT I" with "the class A felony of murder in the second degree ..." in that "on or about May 7, 2008, ... [Dianne] was killed by being shot as a result of the perpetration of the class B felony of burglary in the first degree ... committed by [Appellant]...."[7] She was further charged in "COUNT III" with committing "the class B felony of burglary in the first degree ..." for "knowingly remain[ing] unlawfully in an inhabitable structure ... for the purpose of committing stealing, therein, and while in such ... structure, another participant in the crime threatened immediate physical injury to [Bub], who was not a participant in the crime."[8] She was

7. Section 565.021.1 provides that
A person commits the crime of murder in the second degree if he:
(1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person; or
(2) Commits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

8. Section 569.160.1 provides that

[a] person commits the crime of burglary in the first degree if he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein, and when in effecting entry or while in the building or inhabitable structure or in immediate flight therefrom, he or another participant in the crime:
(1) Is armed with explosives or a deadly weapon or;
(2) Causes or threatens immediate physical injury to any person who is not a participant in the crime; or
(3) There is present in the structure another person who is not a participant in the crime.

further charged in "COUNT IV" with armed criminal action for "knowingly committ[ing] . . . the felony of burglary in the first degree by, with and through the use, assistance and aid of a deadly weapon."

Instruction No. 6, the verdict directing instruction for Count I, felony murder, set out:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that [Appellant] committed burglary in the first degree, as submitted in Instruction No. 8, and

Second, that Roy . . . caused the death of Dianne . . . by shooting her, and

Third, that Dianne . . . was killed as a result of the perpetration of that burglary in the first degree, then you are instructed that the offense of murder in the second degree, has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the commission of that murder in the second degree, [Appellant] acted together with Roy . . . in committing the offense, then you will find [Appellant] guilty under Count I of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all these propositions, you must find [Appellant] not guilty of that offense.

Instruction No. 8, the verdict directing instruction for Count III, burglary in the first degree, instructed as followed:

As to Count III, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about May 7, 2008, . . . [Appellant] knowingly entered an inhabitable structure located in Winona, Missouri, and possessed by [Bub], and

Second, [Appellant] or [Roy] did so for the purpose of committing the crime of stealing therein, and

Third, that while [Appellant] was in the inhabitable structure [Appellant] or another person threatened immediate physical injury to [Bub], and that [Bub] was not a participant in the crime, then you are instructed that the offense of burglary in the first degree, has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the commission of that burglary in the first degree, [Appellant] acted together with Roy . . . in committing the offense, then you will find [Appellant] guilty under Count III of burglary in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all these propositions, you must find [Appellant] not guilty of that offense.

A person commits the crime of stealing if he or she appropriates property or services of another with the purpose to deprive him of her thereof, either without his or her consent or by means of deceit or coercion.

Here, Appellant's argument focuses on her assertion that the burglary was completed when she and Roy entered the home, thus, it cannot be used to support a conviction for felony murder.

 "The felony murder rule derives from common law and permits a homicide to be classified as murder, even though committed unintentionally, if it occurred during the pursuit of a felony." *State v. Williams*, 24 S.W.3d 101, 110 (Mo.App. 2000). Thus, in proving felony murder the

State need not show an intent to kill but only that the homicide occurred in the perpetration or attempted perpetration of a felony. It is the intent to commit the underlying felony, not the intent to kill, that is the gravamen of the felony murder offense. *State v. Williams*, 24 S.W.3d 101, 111 (Mo.App.2000). Put another way, the felony murder rule requires that:

> the [S]tate must prove every element of the underlying felony beyond a reasonable doubt. This is because the underlying felony is necessary in proving the intent element of felony murder. The felony murder rules make the underlying felony not an element of the felony murder, but rather a means of proving the felonious intent for murder.

*State v. Gheen*, 41 S.W.3d 598, 605 (Mo. App.2001) (internal citations omitted). Thus, we consider whether the evidence was sufficient for a finding beyond a reasonable doubt that Appellant committed the offense of burglary in the first degree and that Dianne died as a result of the perpetration of that felony.

■ We initially note that Appellant ignores that she was charged with burglary in the first degree based on the fact that she *"knowingly remained unlawfully in an inhabitable structure* . . . for the purpose of committing stealing . . . and while in such . . . structure, another participant in the crime *threatened immediate physi-* *cal injury* to [Bub]. . . ." (Emphasis added.) The record shows that at the time of Dianne's murder Appellant and Roy were still continuously engaging in the crime of burglary in the first degree as they remained in Bub's home after unlawfully entering it and were actively threatening him at gunpoint up until the moment Dianne was shot. In fact, Appellant had Bub pinned on the floor and was pointing a shotgun to the back of his head when Roy shot Dianne. Under these circumstances, it cannot be said that the burglary in the first degree was completed prior to the time of Dianne's murder. Point II is denied.[9]

In her fourth point relied on Appellant asserts the trial court erred in overruling her motion for judgment of acquittal and in entering "judgment of conviction upon the jury's finding pursuant to Instruction No. 7, submitting armed criminal action. . . ."[10] She maintains this instruction violated her constitutional rights "in that there was no evidence that [she] aided Roy in committing armed criminal action in that her liability for the murder was predicated upon her participation in burglary, not for any intent that Roy kill [Dianne]."

A person commits the offense of armed criminal action if he commits a felony by, with, or through the use, assistance or aid of a dangerous instrument or deadly weapon. § 571.015. As already established in

---

**9.** See discussion in Point IV relative to Instruction No. 7, the verdict directing instruction for armed criminal action relating to the felony murder charge.

**10.** Instruction No. 7 stated:

> First, that [Appellant] committed the offense of murder in the second degree as submitted in Instruction No. 6, and
> Second that Roy . . . committed that offense with the knowing use of a deadly weapon, then you are instructed that the offense of armed criminal action, has occurred, and if you further find and believe

from the evidence beyond a reasonable doubt:

> Third, that with the purpose of promoting or furthering the commission of that armed criminal action, [Appellant] acted together with Roy in committing the offense, then you will find [Appellant] guilty under Count II of armed criminal action.
> However, unless you find and believe from the evidence beyond a reasonable doubt each and all these propositions, you must find [Appellant] not guilty of that offense.

Point II above, Appellant was convicted of felony murder based on the fact that she knowingly entered Bub's home in order to steal from him; she and another person threatened immediate physical injury to Bub, a non-participant in the crime; and Dianne was killed by Roy. While she did not wield the weapon that killed Dianne, Appellant was actively participating in the burglary in the first degree which resulted in the killing of Dianne. Due to her involvement in the burglary in the first degree and the felony murder committed by Roy, the jury was instructed in Instruction No. 5 regarding accomplice liability as follows:

[a] person is responsible for her own conduct and she is also responsible for the conduct of another person in committing an offense if she acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, she aids or encourages the other person in committing it.

Based on her accomplice liability, Appellant was charged and convicted of armed criminal action for "act[ing] together with Roy" in committing felony murder.

■■■■ " 'An accomplice is one who, before or during the commission of a crime, intentionally and knowingly aids or encourages the commission of a crime, and an accomplice is criminally responsible for that offense.' " *State v. Meuir*, 138 S.W.3d 137, 143 (Mo.App.2004) (quoting *State v. May*, 71 S.W.3d 177, 183 (Mo.App.2002)). "Any evidence fairly showing affirmative participation by defendant in aiding another to commit a crime is sufficient to support conviction." *State v. Hibbert*, 14 S.W.3d 249, 252 (Mo.App.2000). Such "[a]ffirmative participation may be proven by circumstantial evidence, including presence at the scene of the crime, flight therefrom, and association with others involved before, during and after the commission of the crime." *Id.* at 253; *see State v. Parmeley*, 854 S.W.2d 524, 526 (Mo.App. 1993). Further, to be liable under accomplice liability the evidence does not have to establish a defendant's specific knowledge of which particular crime his co-participant will commit. *State v. Robinson*, 196 S.W.3d 567, 570 (Mo.App.2006). "A defendant who embarks upon a course of criminal conduct with others is responsible for those crimes which he could reasonably anticipate would be part of that conduct. Proof of any form of participation by the defendant in the crime is sufficient to support a conviction." *State v. Liles*, 237 S.W.3d 636, 640 (Mo.App.2007).

■■■ The State was not required to prove that Appellant intended for Roy to shoot Dianne or that Appellant brandished a weapon in connection with murdering Dianne. As already stated, a defendant who embarks upon a course of criminal conduct with others is responsible for those crimes which he could reasonably anticipate would be part of that conduct. *See State v. Forister*, 823 S.W.2d 504, 508 (Mo.App.1992). In this case, even if Appellant did not foresee that Roy would pick up a weapon and kill Dianne when they first entered the home, as the State points out, the possibility that someone could be killed was apparent when Appellant and Roy took up arms and began threatening to kill Bub. "It is not necessary that a defendant ... have personally used the weapon if [s]he aided or encouraged another to do so." *State v. Mills*, 809 S.W.2d 1, 4 (Mo.App.1990). The law of accomplice liability imputes the criminal agency of Roy to Appellant. *State v. Beggs*, 186 S.W.3d 306, 313 (Mo.App.2005). The evidence shows Appellant's affirmative participation in aiding Roy to commit the crime of burglary in the first degree which resulted in the felony murder of Dianne.

*See State v. Hicks*, 203 S.W.3d 241, 245 (Mo.App.2006); *State v. Burch*, 939 S.W.2d 525, 530 (Mo.App.1997). There was sufficient evidence to convict Appellant of the crime of armed criminal action as set out in Instruction No. 7 pertaining to Count II of the Information. The trial court did not err in denying Appellant's motion for judgment of acquittal and in convicting her of armed criminal action in connection with the felony murder of Dianne. Point IV is denied.

In her fifth point relied on Appellant maintains the trial court erred in overruling her motions for judgment of acquittal and in convicting her of the crime of "armed criminal action associated with the offense of burglary in the first degree ..." because there was insufficient evidence "to prove beyond a reasonable doubt that she gained entry into the house by, with, or through the use, aid, or assistance of a deadly weapon or dangerous instrument."

As already set out above, Appellant was charged in Count III with committing "the class B felony of burglary in the first degree ..." for "knowingly remain[ing] unlawfully in an inhabitable structure ... possessed by [Bub], for the purpose of committing stealing, therein, and while in such ... structure, another participant in the crime threatened immediate physical injury to [Bub], who was not a participant in the crime." She was further charged in "COUNT IV" with armed criminal action for "knowingly committ[ing] ... the felony of burglary in the first degree by, with and through the use, assistance and aid of a deadly weapon." The jury was instructed accordingly in respective Instructions Nos. 8 and 10.

■ What Appellant ignores is the fact that she was charged with entering Bub's home and with being present while Roy "threatened immediate physical injury to [Bub]...." Roy's threats to Bub were made while Roy and Appellant were both holding Bub at gunpoint. Appellant herself admitted to pointing a shotgun at Bub and the other victims during the events that transpired on the afternoon and evening of May 7, 2008. As the State points out, to support a conviction for armed criminal action it is not necessary to prove that the defendant used a deadly weapon or dangerous instrument throughout the pendency of the crime but only that the deadly weapon or dangerous instrument aided the defendant in the commission of the crime. *State v. Hyman*, 11 S.W.3d 838, 841 (Mo.App.2000). The crime of burglary in the first degree, in which Appellant participated, was effectuated "by, with, or through the use, assistance or aid of a dangerous instrument or deadly weapon." § 571.015.1. There was sufficient evidence to prove beyond a reasonable doubt that Appellant committed armed criminal action associated with the offense of burglary in the first degree. The trial court did not err in denying Appellant's motion for judgment of acquittal and in convicting her of the charged offense. Point V is denied.

■ We turn now to Appellant's third and sixth points relied on. We initially note that Appellant's third and sixth points were not preserved below such that she requests plain error review under Rule 30.20.[11] Plain error review involves a two-step process. *State v. Stallings*, 158 S.W.3d 310, 315 (Mo.App.2005). First, we determine whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. *Id.* "Plain errors are evident, obvious, and clear, and we determine whether such errors exist

11. All rule references are to Missouri Rules of Court (2010).

based on the facts and circumstances of each case." *State v. Johnson,* 182 S.W.3d 667, 670 (Mo.App.2005). Absent a finding of facial error, this Court should decline its discretion to review the claim. *Stallings,* 158 S.W.3d at 315. "If plain error is found, we proceed to the second step to consider whether the error actually resulted in manifest injustice or a miscarriage of justice." *Id.* at 315–16. " 'The plain error rule should be used sparingly and does not justify a review of every trial error that has not been properly preserved for appellate review.' " *State v. Myszka,* 963 S.W.2d 19, 24 (Mo.App.1998) (quoting *State v. Phillips,* 939 S.W.2d 502, 505–06 (Mo.App.1997)).

■ "Instructional error, even if clear and obvious, is rarely found to result in manifest injustice or a miscarriage of justice, requiring reversal for plain error." *State v. January,* 176 S.W.3d 187, 193 (Mo.App.2005).

> Review of jury instructions for plain error is discretionary. Unless a claim of plain error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted, this Court will decline to exercise its discretion to review for plain error under Rule 30.20. For instructional error to rise to the level of plain error, the trial court must have so misdirected the jury as to cause manifest injustice or a miscarriage of justice.

*State v. Johnson,* 95 S.W.3d 221, 225 (Mo. App.2003) (internal quotations and citations omitted).

In her third point relied on Appellant maintains the trial court plainly erred in submitting Instruction No. 7 to the jury, "the verdict director for armed criminal action based upon use of a weapon in committing felony murder...." She asserts Instruction No. 7 was in error because Appellant was charged with accom-

plice liability and the jury instruction at issue omitted "Paragraph 1" of Missouri Approved Instructions–Criminal ("MAI–CR 3d") 304.04 and "misdirected the jury to find that her assistance to Roy was sufficient to convict her of armed criminal action when there was no evidence that she intended the underlying homicide or the use of a weapon against [Dianne]."

Rule 28.02(c) provides that "[w]henever there is an MAI–CR instruction or verdict form applicable under the law and Notes on Use, the MAI–CR instruction or verdict form shall be given or used to the exclusion of any other instruction or verdict form." The instruction at issue under this point relied on, Instruction No. 7, the verdict directing instruction for armed criminal action in relation to the felony murder charge, is set out in our analysis of Point IV. It is our view that Instruction No. 7 was correctly patterned after MAI–CR 3d 332.02 and complies with Rule 28.02(c). With that being said, Instruction No. 7 premised Appellant's liability on an accomplice theory. Indeed, all of the verdict directing instructions presented to the jury were premised on accomplice liability such that, instead of instructing the jury in each jury instruction on the theory of accomplice liability, the jury was given Instruction No. 5, which was to apply to all of the instructions.

■ As previously set out in our review of Point IV, Instruction No. 5, relating to accomplice liability instructed that:

> [a] person is responsible for her own conduct and she is also responsible for the conduct of another person in committing an offense if she acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, she aids or encourages the other person in committing it.

Instruction No. 5 follows the first, introductory paragraph specified in MAI–CR 3d 304.04:

[a] person is responsible for his own conduct and he is also responsible for the conduct of (another person) (other persons) in committing an offense if he acts with the other person(s) with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other person(s) in committing it.

As the Notes on Use relating to MAI–CR 3d 304.04 state:

3. The introductory paragraph beginning 'A person is responsible . . .' will be included in all verdict directing instructions based on MAI–CR 3d 304.04, *EXCEPT when all counts and verdict directing instructions submitted are based on accessorial liability and MAI–CR 3d 304.04 is used. In that case, the introductory paragraph will be deleted from the verdict directing instructions and instead given as a separate instruction, which will be given immediately before the first verdict directing instruction.* It will not be repeated. It will be given a number.

(emphasis added). Instruction No. 5 was in conformity with the requirements of MAI–CR 3d 304.04 and its concomitant Notes on Use. Appellant has not demonstrated error which is evident, obvious and clear. She is not entitled to plain error review. *Stallings,* 158 S.W.3d at 315. Point III is denied.

In her sixth point relied on Appellant asserts the trial court plainly erred in "failing to intervene *sua sponte* to effectively admonish the [S]tate when the prosecutor extensively argued and repeatedly offered unsworn testimony, personal insults, opinions and accusations throughout [A]ppellant's cross-examination. . . ." She asserts this "misconduct . . . demonized [her] in the jury's eyes and violated her . . ." constitutional rights to a fair trial. She argues such questioning on the part of the State

was argumentative and insulting, in improper form as consisting of unsworn attacks and uncharged misconduct, as well as other irrelevant matters instead of questions, and not calculated not to elicit information but to argue with and demean [A]ppellant in the eyes of the jury; resulting in a manifest injustice and miscarriage of justice."

In this point relied on Appellant points to almost twenty pages of her cross-examination testimony which she maintains illustrates instances of the prosecutor testifying and offering his own opinions; the prosecutor insulting her in several different ways; the prosecutor lying, "abusing, . . . attacking . . . ," "lectur[ing]," and "challeng[ing]" her; the prosecutor engaging in improper cross-examination; the prosecutor addressing "irrelevant and unsubstantiated matter[s] . . ." as well as matters outside the record; and the prosecutor making innuendos about other potential crimes committed by Appellant and expressing frustration at Appellant. Some of these supposedly prejudicial statements were the subject of objections by her counsel or were included in Appellant's motion for new trial while others were not. Appellant maintains the aforementioned "repeated and egregious" actions attempted to undermine her credibility before the jury and the "cumulative effect of the misconduct was a miscarriage of justice."

The problem this Court has with Appellant's stated point relied on is that it is clearly multifarious. "Multiple claims of error in one point relied on render[ ] the point multifarious and as such is a violation of Rule 84.04, made applicable to briefs in criminal appeals by Rule 30.06(c)." *State v. Garrison,* 276 S.W.3d

372, 379 n. 4 (Mo.App.2009). "Generally, multifarious points preserve nothing for appellate review and are ordinarily subject to dismissal." *Id.* This point relied on as laid out by Appellant puts this Court at a significant disadvantage in that it requires us to examine the record for the various components of her grievances and to determine which issues fall into which category of complaint. We choose not to do so. Point VI is denied.

The judgment and sentence of the trial court is affirmed.

SCOTT, J., and FRANCIS, P.J., concurs.