

# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI, )
)
          Respondent, )
)
  vs. )    No. SD32953
)    Filed: October 3, 2014
GARY LEE MITCHELL, JR., )
)
          Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

Honorable David C. Dally, Circuit Judge

**<u>AFFIRMED</u>**

Gary Lee Mitchell, Jr. ("Mitchell") appeals the trial court's judgment convicting him of the class A felony of drug trafficking in the second degree in violation of section 195.223.[1] Mitchell contends the trial court erroneously admitted evidence, and that the trial court's judgment is not supported by sufficient evidence. Finding no merit to Mitchell's claims, we affirm the judgment of the trial court.

---

[1] The trial court sentenced Mitchell as a prior drug offender to a term of fifteen years. All statutory references are to RSMo Cum.Supp. 2001.

## Factual and Procedural Background

Viewing the evidence in the light most favorable to the trial court's ruling, *State v. Taber*, 73 S.W.3d 699, 703 (Mo.App. W.D. 2002), the evidence presented at Mitchell's trial was as follows.

On November 14, 2009, Deputy Chad Karr ("Deputy Karr"), a narcotics investigator for the Jasper County Sherriff's Office, arrived at a nightclub called "Quincy Magoo's" to attend a going-away party for a colleague. While driving through the parking lot, Deputy Karr noticed two silver Cadillacs. He then observed a white male, whom he recognized as Eric Beckner ("Beckner"), exit one of the Cadillacs carrying a black duffle bag and walk over and place it inside the back passenger seat of the other Cadillac, which had dealer plates. Deputy Karr recognized the Cadillac with dealer plates, which he associated with Mitchell based upon prior encounters with that vehicle. After approximately two minutes, Beckner exited the Cadillac associated with Mitchell without the duffle bag and entered the other Cadillac. Both vehicles then departed from the parking lot and drove away in separate directions.

Deputy Karr was aware that Beckner had been imprisoned for drug violations and that Mitchell had been involved in a shooting incident connected with a drug deal. Both individuals were currently under investigation by the Jasper County Drug Task Force.

Based upon his training and experience,[2] Deputy Karr believed he had witnessed a drug transaction take place.[3] He began following the Cadillac with dealer plates and witnessed it make several lane violations, including changing lanes without signaling and crossing the fog

---

[2] Deputy Karr had been specially trained to intercept controlled substances, which included recognizing certain behaviors that are common among people who are transporting and buying or selling drugs.

[3] According to Deputy Karr, he took no action to stop the transaction because he was in his personal vehicle, in plain clothes, and lacked both his badge and sidearm.

line. Deputy Karr called dispatch and requested the assistance of the closest on-duty officer, which was Deputy Ryan Henley ("Deputy Henley"). During their ensuing conversation, Deputy Karr informed Deputy Henley what he had observed in the Quincy Magoo's parking lot, as well as the subsequent traffic violations.

Deputy Henley then intercepted the Cadillac and initiated a stop, whereupon he confirmed the presence of Mitchell, the driver, and Amanda Updegraff ("Updegraff"), who was sitting in the right-front passenger seat. After reviewing Mitchell's license and registration, Deputy Henley asked Mitchell where he had come from, where he was going, and if he had let anyone into the vehicle. In replying, Mitchell made no mention of Quincy Magoo's and denied having let anyone into the vehicle.

Deputy Henley noted that Mitchell's response was inconsistent with what he had learned from Deputy Karr. Mitchell was asked to step out of his vehicle so that Deputy Henley could further investigate. Deputy Henley proceeded to frisk Mitchell for weapons and, in doing so, felt a bulge that was consistent with "a large amount of money."[4] When asked about the bulge, Mitchell stated that it was approximately $6,200 in cash.[5]

Deputy Karr then approached, identified himself, and informed Mitchell of what he had witnessed in the Quincy Magoo's parking lot. Mitchell then confirmed that he met with Beckner and received a duffle bag, which, according to Mitchell, contained clothing belonging to Beckner. Mitchell also stated that Beckner was en route to Pittsburg, Kansas. Deputy Karr,

---

[4] Deputy Henley testified he was concerned about safety because, in addition to the information he had received from Deputy Karr, Deputy Henley was aware of a shooting incident that had occurred at Mitchell's house in the past.

[5] The record reveals that actual amount confiscated as evidence to be $7,055.

however, had observed Beckner leave Quincy Magoo's travelling east toward Webb City, not west toward Pittsburg.

At this stage in the investigation, Mitchell denied Deputy Henley's request to search the vehicle. At Deputy Henley's request, a canine unit was then deployed to the scene. While the canine unit was en route, Deputy Henley witnessed Mitchell appear to drop something. Mitchell initially denied doing anything, but later admitted that he possessed some marijuana on his person, which he turned over to Deputy Henley. Mitchell was then placed under arrest.

When the canine unit arrived, the dog gave a positive "alert" for the presence of drugs inside the vehicle. The dog then was allowed inside the vehicle and scratched affirmatively at a black duffle bag located on the backseat floorboard under the passenger seat. Inside the duffle bag, police found two bricks of marijuana and two bags of crack cocaine the size of tennis balls.[6] Deputy Henley asked Mitchell and Updegraff whom it belonged to and, at first, neither replied. Deputy Henley then informed Mitchell and Updegraff that they were both being placed under arrest citing the illegal items found within the duffle bag. At this point, Mitchell stated the bag was his.

A subsequent inventory search of the vehicle also revealed the presence of a digital scale in the vehicle's center console. Based on his training and experience, Deputy Henley indicated that the purpose of a digital scale is "[t]o weigh drugs."

Prior to trial, Mitchell's defense counsel filed a motion to suppress the contents of the duffle bag. The motion alleged, *inter alia*, that the search was conducted without probable cause and, therefore, violated the rights granted to Mitchell by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and art. I, §§ 10 and 15 of the Missouri

---

[6] The contents were later valued at between $12,700 and $17,000.

4

Constitution. After hearing the evidence presented at the suppression hearing, the trial court denied the motion. Mitchell's counsel preserved this issue by objection at trial. The jury returned a verdict of guilty.

Mitchell also moved for judgment of acquittal at the close of the State's evidence and, following the jury's verdict, he moved for judgment of acquittal notwithstanding the verdict. Both motions were denied. Mitchell now appeals his conviction.

Mitchell raises two points on appeal challenging the denial of his motion to suppress evidence and admission of the evidence, and motions for judgment of acquittal, which we address out of order for the sake of clarity. The primary issues necessary for resolution of this appeal are:

1. Did the trial court clearly err in concluding that Deputies Karr and Henley had reasonable suspicion that criminal activity had occurred or was occurring justifying the investigatory detention of Mitchell?

2. Was there sufficient evidence to support the jury's verdict that Mitchell committed the crime of drug trafficking in the second degree?

### *Point II: Motion to Suppress*

### Standard of Review

"A trial court's ruling on a motion to suppress will be reversed on appeal only if it is clearly erroneous." ***State v. Sund***, 215 S.W.3d 719, 723 (Mo. banc 2007). We defer to the trial court's factual findings and credibility determinations, and consider all evidence and reasonable inferences in the light most favorable to the trial court's ruling. ***Id.*** In contrast, whether conduct violates the Fourth Amendment is a question of law that we review *de novo*. ***Id.***

5

**Analysis**

The Fourth Amendment to the United States Constitution provides protection from unreasonable searches and seizures. *State v. West*, 58 S.W.3d 563, 568 (Mo.App. W.D. 2001).[7] "Under the principles outlined in *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968), however, a police officer may make an investigatory stop of a person, in the absence of probable cause, when the officer has a reasonable suspicion that the person is engaged in criminal activity." *Id.* "The exception's analysis is twofold: 1) whether the circumstances support a finding of *reasonable suspicion* justifying the initial stop and 2) whether the officer's actions were 'reasonably related *in scope* to the circumstances which justified the interference in the first place.'" *State v. Waldrup*, 331 S.W.3d 668, 673 (Mo. banc 2011) (emphasis in original) (quoting *Terry*, 392 U.S. at 19-20).

Mitchell does not argue that his initial stop was unlawful, nor does he deny that a drug dog "alert" establishes probable cause to search a vehicle. Instead, he argues that at some point prior to the discovery of drugs, his detention became unlawful in that it exceeded the scope of a routine traffic stop.[8] Thus, Mitchell's argument inherently presumes that Deputies Karr and Henley lacked any specific, articulable facts to support an objectively reasonable suspicion that

---

[7] "Article I, section 15 of the Missouri Constitution is coextensive with the Fourth Amendment; consequently, 'the same analysis applies under both provisions.'" *State v. Lovelady*, 432 S.W.3d 187, 190 (Mo. banc 2014) (quoting *State v. Grayson*, 336 S.W.3d 138, 143 n.3 (Mo. banc 2011)).

[8] This Court has recognized the reasonable scope of a routine traffic stop investigation:

> A reasonable investigation of a stop for a traffic violation may include the following steps: (1) asking for the driver's license, registration and proof of insurance; (2) requesting that the driver sit in the patrol car; (3) questioning the driver about his purpose and destination; (4) running a computer check on the driver and his vehicle; and (5) issuing a warning or citation. 'As long as the officer is investigating these items, running the records check, and issuing a citation, the officer may continue to conduct a reasonable investigation of the traffic violation by conversing with the driver.' Thus, a routine traffic stop is not concluded until the warning or citation is issued.

*State v. Jones*, 204 S.W.3d 287, 292 (Mo.App. S.D. 2006) (internal citations omitted).

Mitchell was engaged in criminal activity other than violation of the traffic laws. That presumption is incorrect.

When forming a particularized and objective basis for suspecting criminal activity, police officers are permitted to make use of all of the information available to them. *State v. Norfolk*, 366 S.W.3d 528, 534 (Mo. banc 2012).[9] "'This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might elude an untrained person.'" *State v. Woods*, 284 S.W.3d 630, 635 (Mo.App. W.D. 2009) (quoting *State v. Hawkins*, 137 S.W.3d 549, 558-59 (Mo.App. W.D. 2004)). "Thus, even if the conduct justifying the stop was ambiguous and susceptible of an innocent explanation, an officer is permitted to detain persons to resolve the ambiguity." *State v. Long*, 303 S.W.3d 198, 202 (Mo.App. W.D. 2010).

Prior to any investigatory stop of Mitchell, Deputy Karr observed conduct that, based upon his experience and training, indicated that a drug transaction had occurred. In reaching his conclusion, Deputy Karr was aware of the following facts: (1) a vehicle associated with Mitchell was in the parking lot of Quincy Magoo's, a location where several drug transactions had been reported; (2) Mitchell was currently under investigation by the Jasper County Drug Task Force; and (3) Beckner, another individual under investigation by the Jasper County Drug Task Force, entered the vehicle associated with Mitchell carrying a duffle bag, then exited after two minutes without the duffle bag, and departed in a separate vehicle. Considered collectively, these specific, articulable facts support a reasonable suspicion of illegal activity.

---

[9] In a case such as this where information is gathered by more than one officer, a reviewing court must consider the totality of the circumstances, taking into consideration the collective information possessed by *all* officers connected to the stop. *State v. Goff*, 129 S.W.3d 857, 863 (Mo. banc 2004).

Based on these observations, Deputies Karr and Henley were not limited to investigating whether Mitchell had engaged in traffic violations. This is especially true when, as in this case, additional reasons for suspicion arose during the course of the ensuing investigation. *See, e.g.*, *Woods*, 284 S.W.3d at 638 (officer was not limited to investigating traffic violations of driver, because he "initially was suspicious of criminal activity beyond traffic violations, and as the investigation proceeded, his suspicions only mounted, justifying at each step the actions he took.").[10]

During the investigation, Deputy Henley asked a series of questions ostensibly tailored to elicit information concerning Deputy Karr's observations in the parking lot of Quincy Magoo's. After first omitting mention of his rendezvous with Beckner, thereby adding to Deputy Henley's suspicions, Mitchell acknowledged the meeting but proceeded to provide an unlikely account as to why the meeting took place.

Ten minutes into Mitchell's detention, a canine unit was requested, which arrived 15 minutes thereafter and at a point in time where marijuana had already been discovered on Mitchell's person. This 25-minute period of detention for purposes of investigation was not unreasonable given the circumstances. *See Woods*, 284 S.W.3d at 637-38 (citing numerous cases where detentions lasting 15 minutes to one hour were reasonable while waiting for a canine unit to arrive).

---

[10] Mitchell relies on cases that are inapposite in that they involved situations where a defendant was either (1) detained following the conclusion of a routine traffic stop, *see State v. Barks*, 128 S.W.3d 513 (Mo. banc 2004); *State v. Vogler*, 297 S.W.3d 116 (Mo.App. S.D. 2009); or (2) impermissibly detained beyond what was reasonable in view of the nature of a routine traffic stop, thereby delaying the resolution of the stop. *See State v. Maginnis*, 150 S.W.3d 117 (Mo.App. W.D. 2004).

We find the trial court did not clearly err in concluding that Mitchell's detention was supported by reasonable suspicion, and the ensuing investigation did not exceed the scope of that suspicion. Accordingly, no Fourth Amendment violation occurred. Point II is denied.

*Point I: Sufficiency of the Evidence*

**Standard of Review**

"When reviewing a motion for judgment of acquittal, we apply the same standard of review as the standard used in reviewing a challenge to the sufficiency of the evidence." *State v. McQuary*, 173 S.W.3d 663, 666-67 (Mo.App. W.D. 2005).

> 'We accept as true all evidence tending to prove guilt together with all reasonable inferences that support the finding, and all contrary evidence and inferences are ignored. We determine whether there was sufficient evidence from which a trier of fact could have found the defendant guilty beyond a reasonable doubt. Moreover, this Court does not weigh the evidence or determine the reliability or credibility of witnesses.'

*State v. Gonzalez*, 235 S.W.3d 20, 24 (Mo.App. S.D. 2007) (quoting *State v. Wirth*, 192 S.W.3d 480, 481-82 (Mo.App. S.D. 2006)) (internal citations omitted).

**Analysis**

Mitchell was charged with trafficking drugs in the second degree in that "on or about November 14, 2009 . . . the defendant possessed 24 grams or more of a mixture or substance containing a cocaine base, a controlled substance, knowing of its presence and nature."[11] Mitchell does not dispute that the drugs in question were found; he only disputes that he

---

[11] "A person commits the crime of trafficking drugs in the second degree if . . . he possesses . . . more than eight grams of a mixture or substance . . . which contains cocaine base." § 195.223.3.

9

"possessed" the drugs. *See* § 195.010(34).[12] More specifically, Mitchell contends that he jointly occupied the vehicle where the drugs were found with Updegraff and, for a time, with Beckner. Mitchell suggests that "there was no circumstance that implied that he knew of the presence of the drugs or that the drugs were under his control." Mitchell's claim is without merit.

"To sustain a conviction for possession of a controlled substance, the State must prove (1) conscious and intentional possession of the substance, either actual or constructive, and (2) awareness of the presence and nature of the substance." ***State v. Purlee***, 839 S.W.2d 584, 587 (Mo. banc 1992). "Both possession and knowledge may be proven by circumstantial evidence, which need not be absolutely conclusive of guilt, nor demonstrate the impossibility of innocence." ***State v. Coleman***, 263 S.W.3d 680, 683-84 (Mo.App. S.D. 2008).

"[A] defendant is deemed to have both knowledge and control of items discovered within the automobile, and, therefore, possession in the legal sense, where there is additional evidence connecting him with the items." ***State v. Sanderson***, 169 S.W.3d 158, 164-65 (Mo.App. S.D. 2005) (internal quotation and citation omitted). This additional evidence, considered under the totality of the circumstances, "must demonstrate sufficient incriminating circumstances to permit the inference of a defendant's knowledge and control over the controlled substance." ***Id.*** at 165.

---

[12] Section 195.010(34) defines "[p]ossessed" or "possessing a controlled substance" as:

> a person, with the knowledge of the presence and nature of a substance, has actual or constructive possession of the substance. A person has actual possession if he has the substance on his person or within easy reach and convenient control. A person who, although not in actual possession, has the power and the intention at a given time to exercise dominion or control over the substance . . . is in constructive possession of it. Possession may also be sole or joint. If one person alone has possession of a substance possession is sole. If two or more persons share possession of a substance, possession is joint[.]

These incriminating circumstances include, *inter alia*:

self-incriminating statements, consciousness of guilt, routine access to the place where the controlled substance is found, the commingling of the controlled substance with a defendant's personal belongings, a great quantity of the illegal substance at the scene, [and] the substance in public view and access by defendant[.]

*State v. Smith*, 33 S.W.3d 648, 653 (Mo.App. W.D.2000) (internal citations omitted).

Mitchell downplays that the jury heard testimony from Deputy Henley that Mitchell claimed ownership of the duffle bag *after* it had been opened and its contents were revealed not to be clothing, but a large quantity of marijuana and crack cocaine. Specifically, Mitchell stated the bag was his.[13] In light of this statement, the jury could readily infer not only that Mitchell controlled the duffle bag, but had knowledge of the illegal nature of its contents. *See, e.g.*, *State v. Taylor*, 373 S.W.3d 513, 520 (Mo.App. E.D. 2012) (noting defendant's statement following search that "'all the items [found during the search] were his'" to be a factor in finding both control and knowledge for the purposes of possession). Mitchell was also in contemporaneous possession of marijuana and a large amount of cash, as well as in close proximity to a digital scale, located in the center console of the vehicle. "It is well-settled that 'defendant's contemporaneous possession of other drugs, paraphernalia, weapons, or money is relevant . . . to show that the defendant knowingly and intentionally possessed the controlled substance underlying the charge, and that the defendant knew of its illegal nature.'" *Coleman*, 263 S.W.3d at 684 (quoting *State v. Charlton*, 114 S.W.3d 378 (Mo.App. S.D. 2003)).

Moreover, Mitchell made various statements to Deputy Henley about where he had driven from and why, which proved inconsistent with what Deputy Karr observed in the parking

---

[13] In addressing this statement in his brief, Mitchell argues, contrary to our standard of review, that Mitchell's statement that the bag was his should be disregarded because it was "coerced." We note this evidence was admitted without objection at Mitchell's trial.

11

lot of Quincy Magoo's. "'When proven false, exculpatory statements evidence a consciousness of guilt.'" *State v. Farris*, 125 S.W.3d 382, 389 (Mo.App. W.D. 2004) (quoting *State v. Hibbert*, 14 S.W.3d 249, 253 (Mo.App. S.D. 2000)). Furthermore, Mitchell testified at trial that he thought the duffle bag contained clothing. Because he was convicted, this Court assumes that the jury found Mitchell's testimony to be untruthful. *Woods*, 284 S.W.3d at 640. "'The factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.'" *Id.* at 640-41 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

Based on the foregoing, we conclude that the State presented sufficient evidence to support the jury's verdict that Mitchell committed the crime of drug trafficking in the second degree. The trial court did not err in overruling Mitchell's motion for judgment of acquittal. Point I is denied.

The judgment of the trial court is affirmed.

WILLIAM W. FRANCIS, JR., C.J./P.J. - OPINION AUTHOR

JEFFREY W. BATES, J. - Concurs

DANIEL E. SCOTT, J. - Concurs