

# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI, )
)
Respondent, )
)
v. ) No. SD35443
) Filed: January 27, 2020
LORENZO DARNELL ROY, )
)
Appellant. )

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Thomas E. Mountjoy, Judge

**AFFIRMED**

Lorenzo Darnell Roy ("Roy") appeals his convictions, following a jury trial, of one count of first-degree murder, and one count of armed criminal action. Roy challenges his convictions in seven points on appeal. Finding no merit to Roy's points, we affirm the judgment of the trial court.

**Facts and Procedural Background**

We recite the facts of this matter in accord with the principle that we view the evidence (and the reasonable inferences therefrom) in the light most favorable to the verdict. ***State v. Lammers***, 479 S.W.3d 624, 630 (Mo. banc. 2016).

Roy and Victim met in 2012—they began a stormy relationship and moved into Victim's house together.  On April 9, 2014, the couple looked at wedding rings.  On the evening of April 9 or the early morning of April 10, Victim found a "chat app" or text messages from other women on Roy's phone and accused Roy of cheating on her.  The couple argued at the house, and at approximately 2:00 a.m. on April 10, 2014, Roy left the house.  A lengthy argument ensued through text messages between the couple.

At approximately 9:30 a.m. on April 10, the couple went to breakfast at Hardee's.  There, Roy recognized a woman with whom he had previously worked and spoke to her.  This led to a fresh round of argument between Roy and Victim.  The couple left the restaurant separately, and at around noon, Victim texted Roy and continued arguing about Roy's infidelity.

At approximately 4:53 p.m. on the same day, Roy took a bus to his sister's house.  Around 10:00 p.m., Victim called Richard Snodgrass ("Snodgrass"), and asked him to drive her on various errands.  Snodgrass picked Victim up from her house at approximately 10:31 p.m.  They returned to Snodgrass' apartment, had sex, and then Victim called Roy from Snodgrass' phone.[1]  They ran a few more errands, and Snodgrass drove to an ATM where he withdrew $200, which he gave to Victim.  When Snodgrass returned Victim to her home, he observed a man walk out of the house and wave at him—he "figured it was [Roy]."  Then Snodgrass drove home.

Sometime after 1:32 a.m. on April 11, when Snodgrass brought Victim home, Victim was stabbed 20 to 30 times[2] (suffering several defensive wounds), and sustained blunt force injuries from a cylindrical object.  She bled to death from those injuries.

---

[1] Roy knew Victim had been with Snodgrass because she called Roy from Snodgrass' phone.  Roy was also aware that Victim was accepting money from Snodgrass, and in his text messages to Victim around the time of the murder, Roy implied Victim was guilty of cheating on him.

[2] The evidence at trial reflected that several of the wounds overlapped, making it difficult to determine the precise number of stabs responsible for Victim's wounds.

At approximately 6:54 p.m. on April 11, 2014, police arrived at Victim's home on a dispatch regarding a possible stabbing. Officer Taylor Bolton ("Officer Bolton") observed a man and a woman (later identified as Victim's mother) on the porch. Victim's mother ("Mother") was frantic and upset: "She was screaming that her daughter was dead inside the residence," and that Roy "had killed her daughter." Police searched the house after obtaining a warrant—they found Victim dead on the kitchen floor. There were no signs of forced entry.

In an alley down the street, officers found a pair of yellow rubber gloves turned inside out (one had Victim's blood on it), a large kitchen-style butcher knife (with Victim's blood on it), Victim's driver's license, fingernail polish, a black bra, a plastic handle to a pot, a trash bag with a knife blade sticking out of it (the blade had Victim's blood on it), a purse, a wallet containing Victim's Social Security card, a prescription for Victim, Roy's paystub, and a piece of mail addressed to Roy at Victim's address.

Next to the alley on the other side of a fence, officers also found a frying pan with blood on it, a dented saucepan missing its handle, a mop, and Roy's baseball cap which Roy was seen wearing in bus security footage on the afternoon of April 10, 2014, and which now had blood "all over it."

Police interviewed Mother and Snodgrass, and sought Roy out at the home of his sister, Brenda Boykins ("Boykins"). Roy agreed to accompany police and was interviewed at the police station.

On August 12, 2014, Roy was charged by felony information with the class A felony of murder in the first degree (Count I), pursuant to section 565.020;[3] and armed criminal action (Count II), pursuant to section 571.015.

_____

[3] All references to statutes are to RSMo 2000, unless otherwise indicated.

A jury trial commenced on December 11, 2017. Roy testified in his own defense. The jury found Roy guilty of first-degree murder and armed criminal action. The trial court sentenced Roy to life imprisonment, and 50 years' imprisonment, respectively, with the sentences to run concurrently.

Roy challenges his convictions in seven points on appeal. Additional facts are included below as necessary to address each of Roy's points.

**Principles of Review**

> A trial court has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion. A trial court abuses its discretion only if its decision to admit or exclude evidence is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration. This Court will reverse the trial court's decision only if there is a reasonable probability that the error affected the outcome of the trial or deprived the defendant of a fair trial.

*State v. Wood*, 580 S.W.3d 566, 574 (Mo. banc 2019) (internal quotations and citations omitted).

### *Point I: No Confrontation Clause Violation*

In his first point, Roy argues that the trial court "erred" and "abused its discretion" in overruling defense counsel's objection to Officer Bolton's testimony that Mother said Roy killed Victim. Roy claims that this evidence was "testimonial," and therefore inadmissible pursuant to the Confrontation Clause.

Roy's challenge directs us to the following proceedings at trial, which comprise the underlying substance of his argument:

[STATE:]    And on [April 11, 2014], were you called to 1121 North Sherman in Springfield, Missouri?

[BOLTON:]   I was.

            . . . .

[STATE:]          Why were you dispatched to that location?

[BOLTON:]         We had a report that a possible stabbing had occurred at this location.

[STATE:]          Was that all the information you had as you went to that residence?

[BOLTON:]         That there was a female to the home that had been stabbed and that there was another person there at the home that had called 9-1-1.

[STATE:]          Were you alone or with someone else when you went to that residence on North Sherman?

[BOLTON:]         I was with another officer as an Adam unit, which is two officers to a vehicle.

[STATE:]          And who was that officer?

[BOLTON:]         Officer Bowling.

                  . . . .

[STATE:]          You said that [Mother] was standing out there by the front porch -- or by the front door when you arrived at the house. Can you describe for the jury her demeanor at that time?

[BOLTON:]         She was very frantic and upset. She was screaming that her daughter was dead inside the residence.

[STATE:]          Did she make any other statements about what she thought had happened?

At this time, defense counsel asked to approach the bench, and the following colloquy ensued:

        [DEFENSE COUNSEL:] Judge, I'm going to object at this time to any elicitation as to what [Mother] said to the officer as to what her opinion is of what happened, for a number of reasons. One, because although it does get over the hearsay hurdle of excited utterance, because she was clearly distraught -- I don't challenge that -- but she was making it to an officer; so, it's testimonial. Therefore, I would respectfully submit it violates the right to confrontation.

        And, two, if I'm correct, [the prosecutor] is trying to elicit [Mother]'s statements that she believes Lorenzo Roy did it. That's an ultimate fact and invades the province of the jury. Obviously the State believes he did, but I don't believe

5

it's appropriate for [Mother]'s statements to come in. It is speculative. It goes to an ultimate issue which is for the jury alone. She's not an expert.

[STATE:] First, there is a hearsay exception that applies. It's an excited utterance; so, I don't think that's an issue.

As far as about what the actual content of the statement is, there won't be any evidence that she saw the crime committed or really that this is anything other than speculation on her part.

I think what's significant for the jury to hear is because it helps start to shape the course of the investigation of the law enforcement officers. When knowing that the police officers could have looked into all of these other people, but they decided from the git-go they thought it was Lorenzo Roy and started investigating him first, I think it makes sense to then share the statement that was made by [Mother].

She obviously had an interest in finding who murdered her daughter, and the first thing she said, that it was Lorenzo Roy, is what caused the law enforcement officers to start looking in to [sic] Lorenzo Roy.

THE COURT: Okay. Well, your point about it being testimonial and, therefore subject to [Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.E.2d 177 (2004)], I suppose is what you're telling me, that's what makes the hearsay rule applicable if it's going to be applicable. Excited utterance is an exception to that; so, that's a circular argument.

The fact it goes to the ultimate issue, the entire trial is about the ultimate issue, and the evidence presented goes to the ultimate issue. The jury makes that determination. It's not an opinion. It's excited utterance and part of what happened there during the res gestae of the offense itself.[4]

---

[4] Curiously, Roy claims in his reply brief that the application of *res gestae* was superfluous to the jury's purposes in that: (1) Victim "was killed in her house, which she shared with her boyfriend, [Roy]"; (2) published studies indicate that "[h]omicides perpetrated against women overwhelmingly involve the perpetrators being husbands, ex-husbands, or boyfriends"; and (3) the "data shows it was unnecessary to explain why the police subsequent conduct [sic] would have focused on [Roy] and it was unnecessary for Bolton to testify [Mother] believed [Roy] killed [Victim] because [Roy] would naturally have been a suspect because of their romantic relationship in which [Roy] and [Victim] lived together at [Victim]'s house."

Roy's reliance on "necessary" and "unnecessary" as the criteria for the admissibility or inadmissibility of the State's evidence is misplaced. *See Wood*, 580 S.W.3d at 575 ("Although [defendant] admitted he killed [victim], the state, having the burden of proving defendant's guilt beyond a reasonable doubt, should not be unduly limited in its quantum of proof.") (internal quotation and citation omitted).

Moreover, to the extent that Roy's reply brief concedes—as it seems to do—that it was so overwhelmingly obvious that Roy would "naturally have been a suspect" that it effectively went without saying, it is unclear how *any* prejudice, as necessary for reversal, would attach to: (1) the admission of evidence redundant to such a foregone conclusion (such as that complained of in Roy's Point I); and (2) the trial court's exclusion of evidence as to allegations of police failure "to conduct thorough meaningful investigation" by focusing on Roy instead of following up on other leads (Roy's Point IV).

6

So objection's overruled. It's received.

"We typically review a trial court's evidentiary rulings for an abuse of discretion but determining whether a criminal defendant's rights were violated under the Confrontation Clause is a question of law that this Court reviews de novo." *State v. Edwards*, 579 S.W.3d 249, 255 (Mo.App. E.D. 2019).

The United States Supreme Court in *Ohio v. Clark*, 135 S.Ct. 2173, 2179–81, 192 L.Ed.2d 306 (2015), summarized precedent and principles applicable to the instant challenge:

> The Sixth Amendment's Confrontation Clause,[5] which is binding on the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), we interpreted the Clause to permit the admission of out-of-court statements by an unavailable witness, so long as the statements bore "adequate 'indicia of reliability.'" Such indicia are present, we held, if "the evidence falls within a firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." *Ibid.*
>
> In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), we adopted a different approach. We explained that "witnesses," under the Confrontation Clause, are those "who bear testimony," and we defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.,* at 51, 124 S.Ct. 1354 (internal quotation marks and alteration omitted). The Sixth Amendment, we concluded, prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.,* at 54, 124 S.Ct. 1354. Applying that definition to the facts in *Crawford*, we held that statements by a witness during police questioning at the station house were testimonial and thus could not be admitted. But our decision in *Crawford* did not offer an exhaustive definition of "testimonial" statements. Instead, *Crawford* stated that the label "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*, at 68, 124 S.Ct. 1354.
>
> Our more recent cases have labored to flesh out what it means for a statement to be "testimonial." In *Davis* and *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), which we decided together, we dealt with statements given to law enforcement officers by the victims of domestic abuse. The victim in *Davis*

---

[5] The Missouri Constitution also provides that "in criminal prosecutions the accused shall have the right to . . . meet the witnesses against him face to face[.]" MO CONST. art. I, § 18(a).

made statements to a 911 emergency operator during and shortly after her boyfriend's violent attack. In *Hammon*, the victim, after being isolated from her abusive husband, made statements to police that were memorialized in a "'battery affidavit.'" *Id.,* at 820, 126 S.Ct. 2266.

We held that the statements in *Hammon* were testimonial, while the statements in *Davis* were not. Announcing what has come to be known as the "primary purpose" test, we explained: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.,* at 822, 126 S.Ct. 2266. Because the cases involved statements to law enforcement officers, we reserved the question whether similar statements to individuals other than law enforcement officers would raise similar issues under the Confrontation Clause. *See id.,* at 823, n.2, 126 S.Ct. 2266.

In *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), we further expounded on the primary purpose test. The inquiry, we emphasized, must consider "all of the relevant circumstances." *Id.,* at 369, 131 S.Ct. 1143. And we reiterated our view in *Davis* that, when "the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause." 562 U.S., at 358, 131 S.Ct. 1143. At the same time, we noted that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Ibid.* "[T]he existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry." *Id.,* at 374, 131 S.Ct. 1143. Instead, "whether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id.,* at 366, 131 S.Ct. 1143.

One additional factor is "the informality of the situation and the interrogation." *Id.,* at 377, 131 S.Ct. 1143. A "formal station-house interrogation," like the questioning in *Crawford*, is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused. *Id.,* at 366, 377, 131 S.Ct. 1143. And in determining whether a statement is testimonial, "standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Id.,* at 358–359, 131 S.Ct. 1143. In the end, the question is whether, in light of all the circumstances, viewed objectively, the "primary purpose" of the conversation was to "creat[e] an out-of-court substitute for trial testimony." *Id.,* at 358, 131 S.Ct. 1143. Applying these principles in *Bryant*, we held that the statements made by a dying victim about his assailant were not testimonial because the circumstances objectively indicated that the conversation was primarily aimed at quelling an ongoing emergency, not establishing evidence for the prosecution. Because the relevant statements were

8

made to law enforcement officers, we again declined to decide whether the same analysis applies to statements made to individuals other than the police. *See id.,* at 357, n.3, 131 S.Ct. 1143.

Thus, under our precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.,* at 359, 131 S.Ct. 1143. But that does not mean that the Confrontation Clause bars every statement that satisfies the "primary purpose" test. We have recognized that the Confrontation Clause does not prohibit the introduction of out-of-court statements that would have been admissible in a criminal case at the time of the founding. *See **Giles v. California,*** 554 U.S. 353, 358–359, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008); ***Crawford***, 541 U.S., at 56, n.6, 62, 124 S.Ct. 1354. Thus, the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause.

*Id.* (bolding added to citations).

"It seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots." ***Giles***, 554 U.S. at 365, 128 S.Ct. at 2686 (internal quotation and citation omitted). Likewise, both hearsay[6] and testimonial evidence[7] exclude from their purview testimony offered for a legitimate purpose other than to establish the truth of the matter asserted. ***Williams v. Illinois***, 567 U.S. 50, 78, 132 S.Ct. 2221, 2240, 183 L.Ed.2d 89 (2012).[8]

---

[6] *See **State v. McFadden***, 391 S.W.3d 408, 431 (Mo. banc 2013) ("Hearsay is an out-of-court statement offered for the truth of the matter asserted."); ***State v. Winfrey***, 337 S.W.3d 1, 6 (Mo. banc 2011) ("However, if an out-of-court statement is not admitted to prove the truth of the matter asserted, but for some other purpose that is independently relevant without reference to the truthfulness of the statement, then the statement is non-hearsay.").

[7] *See **Woods v. Etherton***, 136 S.Ct. 1149, 1152, 194 L.Ed.2d 333 (2016) ("The Confrontation Clause prohibits an out-of-court statement only if it is admitted for its truth.").

[8] In such circumstances, defense counsel is at liberty to request a limiting instruction to the jury "that out-of-court statements cannot be accepted for their truth[.]" ***Williams***, 567 U.S. at 81. In the instant matter, defense counsel did not request such a limiting instruction.

Here, the challenged statement was ***not offered to prove the truth of the matter asserted***,[9] but rather to facilitate the development of *res gestae*. As the prosecutor explained following defense counsel's objection:

> As far as about what the actual content of the statement is, there won't be any evidence that [Mother] saw the crime committed or really that this is anything other than speculation on her part.
>
> I think what's significant for the jury to hear is because it helps start to shape the course of the investigation of the law enforcement officers. When knowing that the police officers could have looked into all of these other people, but they decided from the git-go they thought it was Lorenzo Roy and started investigating him first, I think it makes sense to then share the statement that was made by [Mother].
>
> [This] is what caused the law enforcement officers to start looking in to [sic] Lorenzo Roy.

Because the challenged testimony was not offered to prove the truth of the matter asserted (*i.e.*, that Roy killed Victim), it was not testimonial, and not within the purview of the Confrontation Clause.

Even if the testimony had been offered for the truth of the matter asserted, the record in the instant matter, as considered in accord with the "primary purpose test" and other relevant

---

[9] In support of his argument, Roy directs us to ***State v. Robinson***, 196 S.W.3d 567 (Mo.App. S.D. 2006). ***Robinson*** is unavailing. There, defendant was convicted of murder in the second degree and armed criminal action, where the State's case depended on establishing conspiracy (as defendant did not shoot the victim), and defendant's defense was that he did not know his charged co-conspirator would shoot the victim. We reversed and remanded for a new trial where the prosecutor adduced testimony from a sheriff's department investigator that he learned from witnesses "that they overheard 'information'" that defendant and his charged co-conspirator were talking about shooting victim, and displayed a pistol and talked about it to other people. ***Id.*** at 572.

The State claimed on appeal that the statements were not offered for the truth of the matter asserted—however, the record revealed no legitimate purpose for the admission of the statements other than for their truth, *i.e.*, such as to establish an element of the State's case, and undercut an element of defendant's defense. ***Id.*** at 571-72. In the instant appeal, however, there ***were*** legitimate alternative purposes other than the truth of the matter asserted (*e.g.*, *res gestae*), and there was strong evidence of Roy's guilt without the now-challenged statement (unlike ***Robinson***). Moreover, in ***Robinson***, there is no indication that at the time the State offered the evidence, the State designated it for some purpose other than the truth of the matter asserted (seemingly, the argument appeared for the first time on appeal). Whereas in the instant appeal, the prosecutor was explicit—the now-challenged statement was not offered for the truth of the matter asserted at the time the prosecutor offered it. For all of these reasons, ***Robinson*** is distinguishable and unhelpful to Roy's position.

considerations as set out in *Ohio v. Clark*, *supra*, demonstrates that the challenged statement was not testimonial. Officer Bolton responded to a 911 call "[t]hat there was a female to the home that had been stabbed and that there was another person there that had called 9-1-1."[10] Upon arrival, Officer Bolton observed a woman (whom he would later find to be Victim's mother) "very frantic and upset."[11] Without being asked any questions by Officer Bolton, "[s]he was screaming that her daughter was dead inside the residence."[12] At the time Mother made the statement identifying Roy, police had not independently confirmed the identities of the man and the woman standing on the front porch, or independently confirmed the identity or medical status of Victim (or for that matter the number of victims). Nor did police yet have any information to suggest that whomever

---

[10] *See* **Bryant**, 562 U.S. at 375–76, 131 S.Ct. at 1165:

> **For their part, the police responded to a call that a man had been shot. As discussed above, they did not know why, where, or when the shooting had occurred.** Nor did they know the location of the shooter or anything else about the circumstances in which the crime occurred.

*Id.* (emphasis added).

[11] Mother's evident emotional distress and the quick and punctuated substance of her communication does not signal that she would have a "primary purpose" to establish or prove past events for use in prosecution. *See* **Bryant**, 562 U.S. at 374-75, 131 S.Ct. at 1165:

> The circumstances of the encounter provide important context for understanding [victim]'s statements to the police. When the police arrived at [victim]'s side, their **first question to him was "What happened?" [Victim]'s response was either "Rick shot me" or "I was shot," followed very quickly by an identification of "Rick" as the shooter.** [] In response to further questions, [victim] explained that the shooting occurred through the back door of Bryant's house and provided a physical description of the shooter. When he made the statements, [victim] was lying in a gas station parking lot bleeding from a mortal gunshot wound to his abdomen. His answers to the police officers' questions were punctuated with questions about when emergency medical services would arrive. He was obviously in considerable pain and had difficulty breathing and talking. From this description of his condition and report of his statements, we cannot say that a person in [victim]'s situation would have had a primary purpose to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* (internal quotations and citations omitted) (internal footnote omitted) (emphasis added).

[12] Even if Officer Bolton had asked Mother what happened before the now-challenged statement came out (he did not), such a solicitation would not cause Mother's statement to be testimonial in nature under the instant circumstances. *See* **Bryant**, 562 U.S. at 376, 131 S.Ct. at 1165-66:

> The questions they asked—what had happened, who had shot him, and where the shooting had occurred, were the exact type of questions necessary to allow the police to assess the situation, the threat to their own safety, and possible danger to the potential victim and to the public, including to allow them to ascertain whether they would be encountering a violent felon. In other words, they solicited the information necessary to enable them to meet an ongoing emergency.

*Id.* (internal quotations and citations omitted).

stabbed Victim was not still in the house or in the immediate vicinity.[13]  An objective view of the parties and circumstances does not indicate that the "primary purpose" of Mother's statement was to establish or prove past events for possible future use in prosecution.  *See Williams*, 567 U.S. at 57–58, 132 S.Ct. at 2228 (finding that there was no Confrontation Clause violation where a lab report admitted at trial "was sought not for the purpose of obtaining evidence to be used against [defendant], who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose.").  Roy's Point I is denied.

### Point II:  Ultimate Issue

In his second point, Roy argues that the trial court abused its discretion in "overruling counsels' objection to Officer Bolton testifying that [Mother] said that Lorenzo Roy killed [Victim]" because this "was the ultimate issue that was reserved for the jury to decide - whether [Roy] committed the charged offense."[14]

It is not ordinarily proper for a witness, expert or otherwise, "to express [an] opinion on the ultimate issue of whether [defendant] was guilty of the offense charged[.]"[15]  "However, an opinion . . . may be admissible if based on the personal knowledge or observation of the witness."[16]

---

[13]*See Bryant*, 562 U.S. at 377, 131 S.Ct. at 1166.

> **Nothing in [victim]'s responses indicated to the police that, contrary to their expectation upon responding to a call reporting a shooting, there was no emergency or that a prior emergency had ended**.  [Victim] did indicate that he had been shot at another location about 25 minutes earlier, but he did not know the location of the shooter at the time the police arrived and, as far as we can tell from the record, he gave no indication that the shooter, having shot at him twice, would be satisfied that [victim] was only wounded.  In fact, [victim] did not indicate any possible motive for the shooting, and thereby gave no reason to think that the shooter would not shoot again if he arrived on the scene.

*Id.* (emphasis added).

[14] The relevant portion of trial testimony is recited, *supra*, in our discussion of Roy's first point.

[15] *State v. Paglino*, 319 S.W.2d 613, 624 (Mo. 1958).

[16] *State v. Linzia*, 412 S.W.2d 116, 120 (Mo. 1967).

The resolution of an objection that evidence goes to the ultimate issue is within the sound discretion of the trial court, and reviewed for abuse of discretion. ***State v. McWilliams***, 564 S.W.3d 618, 623 (Mo.App. W.D. 2018). Nevertheless, the testimony of a single witness may provide sufficient evidence to support a criminal conviction,[17] and a witness's testimony can (and must) to some extent go to the ultimate issues if it is to be probative and admissible.[18]

Here, Officer Bolton did not testify as to his opinion that Roy committed first-degree murder and armed criminal action. Rather, in line with the legitimate purpose for which this evidence was admitted, Officer Bolton testified to the relevant events of his response and initial investigation as they occurred in order to explain why the investigation's initial focus was on Roy. As the trial court explained in rejecting defense counsel's objection at trial, "[t]he fact it goes to the ultimate issue, the entire trial is about the ultimate issue, and the evidence presented goes to the ultimate issue. The jury makes that determination. It's not an opinion."

Roy fails to demonstrate that the trial court abused its discretion in rejecting defense counsel's objection to Officer Bolton's testimony. Point II is denied.

### Point III: Alleged Police Deception During Roy Interview

Roy's third point argues that the trial court abused its discretion in sustaining the prosecutor's objections to defense counsel's cross-examination of Detective Shipley, wherein defense counsel sought to elicit testimony that during Roy's police interrogation, Detective Shipley

---

[17] ***State v. Alexander***, 505 S.W.3d 384, 395 (Mo.App. E.D. 2016) ("[T]he testimony of only one witness may be sufficient to sustain a conviction, even if the testimony is inconsistent.").

[18] ***Wood***, 580 S.W.3d at 574–75:

> Evidence must be logically and legally relevant to be admissible. Evidence is logically relevant if it tends to make the existence of a material fact more or less probable. Evidence is legally relevant when the probative value of the evidence outweighs unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness.

***Id.*** (internal quotations and citations omitted).

deceived Roy in suggesting Snodgrass "claimed he knew that [Roy] killed [Victim]" in an effort to obtain Roy's confession. Roy suggests that the anticipated answer to this question "called into question the entire credibility of [Detective] Shipley's testimony[.]"

During the State's case-in-chief, defense counsel cross-examined Detective Shipley, resulting in the following colloquy (as relevant here):

> [DEFENSE:] Okay. Now, in the interview -- well, let me ask -- let me back up a minute. When you interview a suspect, would it be fair to say that at times your goal is to elicit a confession?
>
> [SHIPLEY:] To elicit the truth, yes.
>
> [DEFENSE:] Okay. And is it true that police officers are allowed to use deception to do that?
>
> [SHIPLEY:] Yes, they are.
>
> [DEFENSE:] Okay. Did you do that with Mr. Roy?
>
> [SHIPLEY:] Yes, I did.
>
> [DEFENSE:] Okay. And how did you do that?

The prosecutor then objected on the bases that: (1) the anticipated testimony would be hearsay; (2) the State did not present evidence of "conversations between Detective Shipley and [Roy] in which the detective asserted facts that may or may not have been true to [Roy] to see how [Roy] would respond"; and (3) Roy was attempting to elicit "self-serving hearsay[.]"

Defense counsel indicated that he did not intend to elicit any statements from Detective Shipley as to what Roy said, but instead intended to ask Detective Shipley: "[I]isn't it true you told him Richard Snodgrass identified him? Detective will probably say yes. And I'll say that: And that didn't elicit a confession, did it? There's not any hearsay in that." The prosecutor suggested that this was self-serving hearsay because the effect would be a denial from Roy. The trial court made the following ruling: "The question only has value to the extent that there's an

14

answer. If you can't ask -- if you can't expect to hear the answer, then you can't ask the question. So the objection is sustained. It's in the category of self-serving."

We are doubtful that the described testimony regarding Roy's silence represented "self-serving hearsay" subject to exclusion.[19] Nevertheless, "[w]e will uphold the court's ruling on the admissibility of evidence if it is sustainable under any theory." *State v. Townsel*, 564 S.W.3d 731, 736 (Mo.App. S.D. 2018). "The exclusion of evidence is harmless beyond a reasonable doubt where the excluded evidence is cumulative of other evidence which was admitted at trial." *State v. Ellis*, 512 S.W.3d 816, 825 (Mo.App. W.D. 2016) (internal quotation and citation omitted). Here, defense counsel successfully adduced testimony from Detective Shipley that "police officers are allowed to use deception" to elicit confessions, and Detective Shipley used deception with Roy. The jury heard no evidence that Roy confessed (wherefrom the jury was at liberty to infer that no confession was obtained). The additional testimony sought to be adduced—a specific instance of deception,[20] and Roy's silence in response to that specific instance of deception—was substantively cumulative to the evidence already adduced, and its reasonable available inferences. *See id.* at 825.[21]

---

[19] "[A]s a general rule, a defendant cannot create exculpatory evidence by introducing self-serving, hearsay statements made by the defendant to another." *Ellis*, 512 S.W.3d at 835 (internal quotation and citation omitted). *See Coday v. State*, 179 S.W.3d 343, 357 (Mo.App. S.D. 2005) (discussing requirements of "tacit admission rule" such as "to show acquiescence to the truth of an incriminating statement when the accused fails to deny, contradict, or object to an accusatory statement made in his or her presence.").

[20] In its brief, the State contends that there was no underlying factual basis for Roy's claim of deception. Detective Shipley testified at trial that Snodgrass reported having seen Roy on Victim's porch on the night of the murder. However, we need not reach that issue, as Roy's claim would fail regardless.

[21] Further, while the trial court "cannot bar cross-examination into [a witness's bias or interest] completely[,]" it does have "discretion in limiting the *scope* and *extent* of cross-examination bearing" on those issues. *Winfrey*, 337 S.W.3d at 8 (emphasis added). Assuming *arguendo* that there was probative value—as to Detective Shipley's credibility—in evidence that police are allowed to use deception, and that Detective Shipley used deception with Roy, the trial court would have been within its discretion to find that the ceiling of reasonable probity had been reached when the State's (different) objection was lodged and sustained. *See Townsel*, 564 S.W.3d at 736.

15

Roy fails to demonstrate that the trial court abused its discretion in sustaining the prosecutor's objection to defense counsel's proposed cross-examination of Detective Shipley. Point III is denied.

### Point IV: Police Investigation

In his fourth point, Roy argues that the trial court abused its discretion in sustaining the prosecutor's objection to defense counsel's cross-examination of Detective Shipley such as to adduce testimony that "both he and the Springfield police generally failed to conduct thorough meaningful investigation into [Mother]'s concerned reporting to Shipley about" (1) Victim's drug involvement; and (2) Victim's previous theft of a drug dealer.

The prosecutor filed a motion in limine to exclude any evidence that someone other than Roy was responsible for Victim's death, or that some other person had motive or opportunity to commit the charged offenses. At the pre-trial hearing on this motion, the trial court made the following ruling:

> I suppose, by definition, if a defendant denies committing the crime, it is inherently a suggestion that someone else did it, assuming that there's been a crime committed. So that's not what we're dealing with.
>
> . . . .
>
> What we're dealing with is innuendo and some showing, by evidence or otherwise, that someone had motive or opportunity, which just simply isn't enough. It's got to go beyond those. So I'm going to grant [the prosecutor's motion].
>
> But having said that, if there is a change in circumstances, based upon the evidence presented by the State or whatever developed, then the defense can approach outside the presence of the jury to argue that there's been some exception created based on what's come into evidence. That's always true in regard to motions in limine, but it's true in this specific. Just as a statement of black-letter law, then, it's granted.

At trial, during the State's case-in-chief, defense counsel made the following argument outside the presence of the jury:

[DEFENSE COUNSEL]: [O]ne of the issues in this case that the State has brought up objecting to is us presenting what is known as the SODDI defense, which is "some other dude did it." And my questions with Detective Shipley are going to be for the purpose of impeaching his thoroughness and the quality and bias of his investigation. I think that's the extent of examination -- or the questioning on cross-examination is extensive. I believe that the State has clearly raised an inference through the testimony that his -- that Detective Shipley's investigation was thorough, and they are certainly permitted to do that. I believe that I am entitled to impeach that.

Roy made an offer of proof on this issue wherein defense counsel adduced testimony from Detective Shipley that a week after Victim's murder, Mother reported to him that on the day of the murder, Victim brought several half-gram bags of methamphetamine to her house and said she was going take it to a friend's house to use. Mother explained that she had not thought to disclose this fact earlier because it happened "every other day[.]" Defense counsel also adduced testimony from Detective Shipley that Mother had concerns that Victim might have "ripped off" a drug dealer, and that Victim did this all the time. The prosecutor adduced testimony from Detective Shipley that he did not "have any evidence that connects [the drug dealer] with the homicide in this case[,]" and that Detective Shipley had reviewed numerous police reports reflecting domestic violence by Roy against Victim.

Defense counsel argued that the evidence as to Victim's drug use was admissible to corroborate Roy's statement to police that Victim had a drug problem, in order to bolster Roy's credibility. As to the testimony that Victim was in the practice of "ripp[ing] off" a drug dealer, defense counsel argued such was admissible "to show that the detective was given a lead by the victim's mom and didn't pursue it[,]" and that "this was, in fact, a rush to judgment, and they zeroed in on Mr. Roy, to the exclusion of any other leads."

In relevant part, the trial court made the following ruling on this issue:

Well, [defense counsel] you've dressed it up nicely, but it is still an attempt to get before the jury the fact that someone else may have committed the offense,

17

and that is a very precise area of the law in Missouri that says you cannot do that just because you have -- there is motive or opportunity.

In this instance, you're talking about motive. That's exactly what someone telling the officer that she had a conflict with someone else, that's what that is. It is motive. If you don't have anything more than motive, you cannot bring that in front of the jury. The law is clear on that. You can dress it up in some other purpose, but it is what it is.

The fact that that excited utterance came out with the initial arrival of law enforcement does not create any sort of hole that you can drive that particular truck through. So, at any rate, I'll maintain the ruling as far as the motion in limine is concerned, and I'll sustain any objection to that line of inquiry.

"Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible without proof that such other person committed some act directly connecting him with the crime." *State v. Schaal*, 806 S.W.2d 659, 669 (Mo. banc 1991) (internal quotation and citation omitted). "When the evidence is . . . disconnected or remote and there is no evidence that the other person committed an act directly connected to the offense, the minimal probative value of the evidence is outweighed by its tendency to confuse or misdirect the jury." *State v. Bowman*, 337 S.W.3d 679, 686 (Mo. banc 2011).

> To be admissible, evidence that another person had an opportunity or motive for committing the crime for which a defendant is being tried must tend to prove that the other person committed some act directly connecting him with the crime. The evidence must be of the kind that directly connects the other person with the *corpus delicti* and tends clearly to point to someone other than the accused as the guilty person. Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.

*State v. Nash*, 339 S.W.3d 500, 513 (Mo. banc 2011) (internal quotation and citation omitted).

In support of his claim, Roy directs us to *State v. White*, 81 S.W.3d 561 (Mo.App. W.D. 2002) and *State ex rel. Koster v. McElwain*, 340 S.W.3d 221 (Mo.App. W.D. 2011). As the prosecutor pointed out at trial, as the trial court pointed out in its ruling, and as the State now points

18

out in its brief, *White* and *McElwain* were both *Brady*[22] violation cases dealing with discovery issues, not the admissibility of evidence.[23]  As such, these cases are inapplicable here, and yield no support to Roy's argument.

Roy fails to demonstrate that the trial court abused its discretion in sustaining the prosecutor's objection to defense counsel's cross-examination of Detective Shipley.  Point IV is denied.

### Point V:  Alleged Hearsay Testimony (Davis/Boykins)

In his fifth point, Roy argues that the trial court "erred" and "abused its discretion" when it "overruled the hearsay objection to Tedrick O'Neal Davis testifying that [] Roy's sister, Brenda Boykins, asked Davis to tell the police that [Roy] was at her house the entire time and had not left there to go to [Victim]'s house as the state claimed[.]"  Specifically, Roy points to the fact that "the state had successfully moved to exclude any statements from Boykins as hearsay because she was deceased[,]" and claims "it was prejudicial and fundamentally unfair to inject Boykins' statement to advance its case after successfully having moved to exclude any use of Boykins' statements by the defense."

___

[22] *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

[23] In *White*, the Western District was explicit about the limitations of its holding:  "***In the particular circumstances of this case***, the **State's intentional decision to withhold the information** in question sufficiently undermines confidence in the verdict that it was an abuse of discretion for the trial court to deny the motion for new trial." 81 S.W.3d at 571 (emphasis added).  The Western District was just as explicit in *McElwain*, where the court observed that evidence that another person merely had opportunity and motive—though warranting a new trial for non-disclosure pursuant to *Brady*—"***would not have been admissible at [defendant's] first trial*** under the authority of [*State v.*] *Chaney*[, 967 S.W.2d 47, 55 (Mo. banc 1998)]." *McElwain*, 340 S.W.3d at 253 n.29 (emphasis added).

Roy also directs us to *McLaughlin v. State*, 378 S.W.3d 328, 354 (Mo. banc 2012), wherein the Supreme Court recited that "[i]f evidence is admissible for one purpose but improper for other purposes, it should be received, subject to limiting instruction, if requested." (internal quotation and citation omitted).  While limiting instructions are favored as to admissible evidence, Roy fails to direct this Court to any authority indicating that "lack of thoroughness in police investigation" or "rush to judgment" by the police are independent bases for admissibility.

The State filed a motion in limine requesting the exclusion of any statements Boykins made regarding Roy's location at the time of the crimes charged, for the reason that Boykins was deceased at the time of trial, and such statements would be inadmissible hearsay. At the pre-trial hearing on the State's motion, defense counsel represented to the trial court that he did not oppose the motion, and the trial court granted it accordingly.

During the defense's case-in-chief, the State elicited the following testimony during its cross-examination of defense witness Davis (in relevant part):

[STATE:]    Sir, let me get this straight. The defendant learned about [Victim]'s death there at Brenda's house?

[DAVIS:]    Yes.

[STATE:]    Now, the defendant came over to that house the early-morning hours of Friday, April 11th; isn't that true?

[DAVIS:]    I was barbecuing, so I—it was that evening.

. . . .

[STATE:]    And isn't it true Brenda told you to tell the police that he was there the whole time?

[DAVIS:]    Yes.

[DEFENSE COUNSEL]:    Objection. Hearsay.

THE COURT:    Asked and answered.

[STATE]:    Nothing else, Your Honor.

"An objection to testimony must be made at the earliest possible opportunity to allow the trial court to invoke remedial remedies." *State v. Blurton*, 484 S.W.3d 758, 774 (Mo. banc 2016). "A trial court's ruling on an objection is preserved for appellate review only if the objection was timely or the party timely moved to strike the answer." *Id.* Roy did not object until after: (1) the prosecutor finished his question, clearly presaging the manner of substance to be adduced by the

20

witness's answer; and (2) the witness answered in the affirmative, consistent with the substance anticipated by the prosecutor's question. When Roy lodged this untimely objection, he requested no relief.[24]

Relying on **Blurton**, 484 S.W.3d at 774, Roy argues his claim is nevertheless preserved in that "[t]he objection made here was timely because Davis answered so quickly with a one word response that it was impossible to object sooner." Roy fails to account for the requirement, recited in **Blurton**, that the objecting party (in such instance) move to strike the witness's answer. **Id.** Roy failed to do so, and his preservation argument is therefore unavailing.[25]

Roy fails to demonstrate reversible error in his Point V,[26] and we therefore deny the same.

---

[24] It is said that a party "has no claim of reversible error[]" who "received the relief he requested[.]" **Blurton**, 484 S.W.3d at 744 (internal quotation and citation omitted). Thus, it follows that "[a] party cannot fail to request relief, gamble on the verdict, and then, if adverse, request relief for the first time on appeal." **State v. Bennett**, 201 S.W.3d 86, 88 (Mo.App. W.D. 2006).

[25] Roy requests that "[i]f this Court believes the objection was untimely, then plain error review is requested[.]" This request is confounded by the absence in Roy's brief of the manner of *sua sponte* relief Roy suggests the trial court plainly erred in failing to effect. Nevertheless, due to the seriousness of the matters at issue, this Court has independently reviewed the record, and discerns no plain error in the vein complained of in Roy's fifth point. Moreover, we are compelled to take note of the guidance provided in **United States v. Jorn**, 400 U.S. 470, 486, 91 S.Ct. 547, 558, 27 L.Ed.2d 543 (1971): "[I]n the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." Thus, defense counsel's (and Roy's) decision to request specific relief (or not) in light of perceivedly objectionable matters at trial is entitled to significant deference.

[26] Roy's argument relies on **State v. Weiss**, 24 S.W.3d 198 (Mo.App. W.D. 2000) and **State v. Luleff**, 729 S.W.2d 530 (Mo.App. E.D. 1987). Both cases are inapposite in that they concern deviations from rulings made by the trial court *at trial*. The instant matter concerns an *in limine ruling*—"a ruling on a motion in limine is interlocutory and subject to change during trial." **Wood**, 580 S.W.3d at 577. Rather, the proponent of evidence excluded in a motion in limine "must attempt to present the excluded evidence at trial, and if an objection to the proffered evidence is sustained, the proponent must then make an offer of proof." **State v. Cole**, 71 S.W.3d 163, 175 (Mo. banc 2002). In accord with these principles, a motion *in limine*—in and of itself—preserves and presents no issue on appeal. **State v. Prince**, 534 S.W.3d 813, 818 n.2 (Mo. banc 2017).

Here, Roy's argument implicitly presents Roy as the disappointed proponent of the Boykins evidence—in his brief, Roy suggests that the State "got all possible use of statements by the defense and attributable to Brenda Boykins excluded, but when it perceived her hearsay statements advanced its case it injected them during its questioning of Davis." To the extent Roy wished to present such evidence, he could have requested permission via bench conference, or attempt to adduce it (as the State did) subject to objection or trial court intervention. *See* **Cole**, 71 S.W.3d at 175. Roy failed to do so. Moreover, when the State adduced the Boykins evidence, it opened the door to such evidence to Roy—nevertheless, Roy did not adduce, or attempt to adduce such evidence, his failure as to which he now (ineffectually) lodges grounds for complaint on appeal.

21

***Point VI: Substantial Evidence Supported Convictions***

In his sixth point, Roy challenges that the State "failed to present sufficient evidence that

[Roy] killed [Victim]."[27]

> To determine whether the evidence presented was sufficient to support a
> conviction and to withstand a motion for judgment of acquittal, this Court does not
> weigh the evidence but rather accepts as true all evidence tending to prove guilt
> together with all reasonable inferences that support the verdict, and ignores all
> contrary evidence and inferences. This Court's review is limited to determining
> whether there was sufficient evidence from which a reasonable juror might have
> found the defendant guilty beyond a reasonable doubt. This is not an assessment
> of whether this Court believes that the evidence at trial established guilt beyond a
> reasonable doubt but rather a question of whether, in light of the evidence most
> favorable to the State, any rational fact-finder could have found the essential
> elements of the crime beyond a reasonable doubt.

***State v. Ess***, 453 S.W.3d 196, 206 (Mo. banc 2015) (internal quotations and citations omitted).

"The State may prove its case by presenting direct or circumstantial evidence. Upon

appellate review, circumstantial evidence is given the same weight as direct evidence and the fact

finder may make reasonable inferences from the evidence presented." ***State v. Cordell***, 500

S.W.3d 343, 345 (Mo.App. S.D. 2016).[28]

A challenge to the sufficiency of the evidence to support a criminal conviction requires

appellant to complete three distinct analytical steps: (1) "Identify a challenged factual proposition

---

[27] Relying on ***State v. Bennett***, 6 S.W.2d 881, 882 (Mo. 1928) for the proposition that evidence "improperly admitted cannot be considered in deciding whether there was sufficient evidence[,]" Roy claims that the admitted evidence challenged in his first and second points should not be considered in evaluating his substantial-evidence challenge. Roy's evidentiary arguments in his first and second points are unavailing, rendering this argument moot. Nevertheless, we observe that Roy's substantial-evidence challenge would fail regardless of whether the evidence challenged in his first and second points were considered.

[28] As the United State Supreme Court has indicated:
> Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly,
> circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally
> true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence
> correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the
> jury must use its experience with people and events in weighing the probabilities. If the jury is
> convinced beyond a reasonable doubt, we can require no more.

***Holland v. U.S.***, 348 U.S. 121, 139-40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954).

needed to sustain the conviction"; (2) "Identify all favorable evidence in the record tending to prove that proposition"; and (3) "Show why such evidence, when considered along with its reasonable inferences, is so non-probative that no reasonable fact-finder could believe the proposition." *State v. Finch*, 398 S.W.3d 928, 929 (Mo.App. S.D. 2013). Roy's challenged factual proposition (step 1) is that Roy killed Victim. Thus, his evidentiary challenge is properly reduced to the *actus reus* of section 565.020.1—that Roy "caused the death of another person[.]" *State v. Hudson*, 154 S.W.3d 426, 429 (Mo.App. S.D. 2005) (internal quotation and citation omitted).[29]

To a significant degree, Roy's substantial-evidence challenge hinges on the success of the evidentiary challenges in his other points. For the reasons indicated in our discussions of those claims, Roy's evidentiary challenges are unavailing individually, and as to Roy's substantial-evidence argument.[30]

Viewed in the light most favorable to the verdict, the following evidence is pertinent to Roy's challenge.

---

[29] Roy does not challenge the sufficiency of the remaining elements of murder in the first degree, pursuant to section 565.020.1—*i.e.*, that his actions were: (1) knowingly—aware of the nature of his conduct, or aware that his conduct is practically certain to cause that result; or (2) performed after deliberation. While Roy's brief does not state so directly, his challenge to the *actus reus* element of murder in the first degree serves as an implied challenge to his armed criminal action conviction, pursuant to the commission of felony element of that offense. *See* § 571.015 ("[A]ny person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous or deadly weapon is also guilty of the crime of armed criminal action[.]").

[30] Roy relies on *State v. Taylor*, 422 S.W.2d 633 (Mo. 1968), for the proposition that the jury's disbelief of a defendant's testimony "is not probative and does not constitute substantive proof on a material issue not theretofore proved." *Id.* at 638. This premise has been rejected by our appellate courts, and the opposite rule now prevails: "'[t]he factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.'" *State v. Woods*, 284 S.W.3d 630, 640-41 (Mo.App. W.D. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). *See State v. Mitchell*, 442 S.W.3d 923, 931 (Mo.App. S.D. 2014); *cf. Copher v. State*, 570 S.W.3d 178, 184 (Mo.App. S.D. 2019) ("If [defendant] took the stand, and was as thoroughly impeached and discredited as trial counsel reasonably feared, the jurors could have just as easily found [defendant's] testimony to be incredible, thus solidifying their conclusion as to his guilt[.]"); *Payne v. State*, 509 S.W.3d 830, 839 (Mo.App. W.D. 2016).

Roy and Victim began dating in 2012. Though their relationship was stormy, Roy moved into Victim's house. On April 9, 2014, they looked at wedding rings. Sometime that evening or the early morning of April 10, Victim found either a "chat app" or text messages from other women on Roy's phone, and accused Roy of cheating on her. Roy took his phone back from Victim and left their house at around 2:00 a.m. At approximately 2:20 a.m., Roy and Victim began a heated and extensive argument through text messages. The substance of the text conversation was that each accused the other of cheating. The two continued to fight through text messages for the remainder of the day.

At around 10:00 p.m. on April 10, Victim called Snodgrass for a ride to run some errands. Snodgrass picked her up and drove to Snodgrass' apartment where they had sex. Victim called Roy from Snodgrass' house. Then Snodgrass drove to an ATM and withdrew $200, which he gave to Victim. The two drove to Walgreens, filled a prescription for Victim, and returned to Victim's house at 1:32 a.m. As Victim walked to the house, Snodgrass saw Roy walk out onto the porch and wave to him.

Meanwhile, Roy knew Victim was with Snodgrass because she called from his apartment phone. Roy was also aware that Victim was accepting money from Snodgrass, and in his text messages to Victim around the time of the murder, Roy implied Victim was guilty of cheating on him. Roy testified that Victim taking money from Snodgrass made him "feel like less of a man."

During the day of April 11, 2014, Roy claimed to be at work on a construction site where he was "not supposed to be on [his] phone." Nevertheless, he decided to call and text Victim multiple times, to which he received no response. He claimed to have been so concerned that he called Victim's mother at 4:00 p.m.—an hour before he got off work—and "I told her: Have you

24

seen [Victim]? Is she still PO'd? You know, I was kind of worried about her seeing the PO. And she said: She's probably just out and asleep; I'll check on her later."

When Roy got off work at 5:00 p.m., he did not return home to check on Victim (despite his supposedly immediate concern for her throughout the day). Instead, he went to his sister's house "because I wanted to change clothes. I didn't know if she was still on one or what, you know, so I didn't need any confusion." Roy claimed he attended a barbeque at his sister's house that evening, left and went to a local grocery store, and then went back to his sister's.

Two knives with Victim's blood on them and other items from Victim's house were found in an alleyway down the street. Roy's hat was found in the alley covered in Victim's blood—bus security camera footage on April 10 showed Roy wearing the same hat at approximately 5:02 p.m.

Roy's statements to the police and his testimony at trial also suggested that Roy committed the murder. Roy asserted to Detective Shipley that his sister told him Victim had been stabbed, but Detective Shipley had not informed her of such, and there was no evidence that Roy's sister would have had any independent knowledge of the murder. Roy claimed he did not know how his sister knew and did not know when his sister told him. A reasonable fact-finder could infer that Roy knew Victim had been stabbed because he was the one who stabbed her, and he was trying to hide this fact by suggesting he heard about the crime from someone else.

Roy, in both of his statements to police, denied seeing Victim after the afternoon of April 10 when they met getting on and off the bus. When confronted, Roy could not explain why his hat was found in the alley with the murder weapons, covered in Victim's blood. At trial, however, Roy for the first time claimed he saw Victim on the evening of April 10 and that she

25

took his hat.  A reasonable fact-finder could infer that Roy fabricated this version of events in an attempt to obscure his underlying guilt of the crimes charged.

This is by no means an exhaustive recitation of all the evidence in the record lending support to Roy's conviction, but the evidence recited was sufficient for a reasonable fact-finder to find Roy guilty of murder in the first degree and armed criminal action.  Roy's Point VI is denied.

### Point VII:  Juror Disqualification

In his seventh point, Roy argues that the trial court abused its discretion in rejecting his request that venireperson Shortt be dismissed for cause "in that Shortt expressed a per se partiality for police officer testimony[.]"

> The circuit court's ruling on a challenge for cause will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion. Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.  The qualifications for a prospective juror are not determined from a single response, but rather from the entire examination.

*Wood*, 580 S.W.3d at 580 (internal quotations and citations omitted).

During voir dire, the prosecutor asked the venire panel whether they would "automatically believe a law enforcement officer just because they come in wearing a uniform and say I'm a law enforcement officer?"  A second venireperson answered in the affirmative.  The prosecutor also asked the venire panel whether "you agree with me that when you're judging the credibility of any witness, any sort of training, background, experience they've had would be something that you would want to know as you're trying to decide whether or not to believe what they're telling you?"  Again, the second venireperson answered in the affirmative.  Thereafter, the prosecutor asked the

following: "If a police officer comes in here and says, yes, I am a police officer, are you going to believe everything they say after that?" A third venireperson answered in the affirmative.

During the defense portion of voir dire, defense counsel recalled the prosecutor's earlier questioning regarding whether any of the venire members would automatically believe a police officer, and asked if anyone felt in accord therewith. A fourth and fifth venireperson answered in the affirmative. Defense counsel then asked whether anyone else agreed. Receiving no affirmative response (including from Shortt), defense counsel persisted in the inquiry as follows:

> If credibility is measured on a scale of one to ten for a police officer as a witness, number one being not credible and number ten being very credible, let's say -- we'll say every witness in a case. So every witness starts out at zero, and then you would give each one a rating.

> If you had a police officer, would you start out at zero, or would you start out at one-half or one and a half or two versus starting at zero, before you make a determination after hearing the evidence?

Numerous venirepersons responded that they would rate police officers at "ten" or in a "high range." Venireperson Shortt responded that she "would not start at zero with a police officer. I would be inclined to start more at a high range."

Defense counsel lodged challenges for cause for thirteen venire members (including Shortt), arguing that their responses to his one through ten scale indicated that they would give more weight to law enforcement testimony. The trial court responded (appropriately) as follows:

> It is not a principle of law that a police officer or any other witness has a credibility scale from zero to ten or whatever it may be. There's nothing in the instructions about that. There's nothing in the law about that, to my knowledge.

> And the -- I have no idea what these people would have been asked if they'd said: If you had a priest testify, where would you start them on a credibility scale? Or if you had a -- if you had a schoolteacher testify, where would you put them on a credibility scale? Or if you had somebody that sold drugs, where would -- where would they be on the credibility scale?

27

It's just all anecdotal as far as I'm concerned. It became very clear through that whole colloquy back and forth that that became a referendum on whether they thought highly of police officers or not, and there was a lot of speaking in favor of that. But the crucial questions actually had been asked by [the prosecutor] on State voir dire in terms of giving greater weight to a law enforcement officer's testimony.

We have at least two people who answered in such a way that they were subject to be stricken for cause.

. . . .

But the rest of this anecdotal exchange about where you would put them on a scale I don't believe rises to the level of anything that would require them to be stricken.

A trial court's decision not to replace a juror with an alternate closely depends on determinations of credibility and fact, which are properly for the trial court. *State v. Stewart*, 517 S.W.3d 680, 683–84 (Mo.App. S.D. 2017).

The proponent of such a claim must demonstrate, in light of the trial court's authorized explicit and implicit fact findings, the venireperson's experience *would* (or *did*) "produce bias or prejudice against the defendant on trial." *Id.* at 684 (internal quotation and citation omitted) (emphasis added). This is a high bar: a venireperson's admission that a family member had been the victim of a very similar crime, that she would be "unable to put aside this experience," and that she "could not refrain from using that experience to persuade others during deliberation[,]" would not oblige the trial court to strike that venireperson for cause even if explicitly requested to do so. *Id.* at 684 n.3; *see State v. Kinder*, 942 S.W.2d 313 (Mo. banc 1996). "When there is ambiguity in the venireperson's statements, the circuit court can resolve the ambiguity in favor of the state." *Wood*, 580 S.W.3d at 581.

Roy fails to meet his high burden to demonstrate, in light of the convoluted nature of defense counsel's questioning, the extremely limited colloquy as relevant to the challenged juror, and the trial court's implicit fact findings, that Juror Shortt's presence on the jury would (or did)

28

produce bias against Roy. ***Stewart***, 517 S.W.3d at 683-84; *see **Kinder***, 942 S.W.2d at 336. The trial court did not abuse its discretion. Point VII is denied.

The judgment of the trial court is affirmed.

WILLIAM W. FRANCIS, JR., J. – OPINION AUTHOR

GARY W. LYNCH, P.J. – CONCURS

NANCY STEFFEN RAHMEYER, J. – CONCURS